**Deborah Ann COLLIER, Plaintiff,**

**v.**

**Clifton C. MILLER, in his official capacity as Acting Director of Traffic and Security at the University of Houston, and W. G. Bell, individually and as an agent and officer of the Traffic and Security Department at the University of Houston, Defendants.**

Civ. A. No. 74–H–297.

United States District Court,
S. D. Texas,
Houston Division.

May 28, 1976.

---

Peter D. Williamson, Houston, Tex., for plaintiff.

John L. Hill, Atty. Gen. of Tex., Austin, Tex., Calvin Botley, Asst. Atty. Gen., Houston, Tex., for defendants.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

## I. INTRODUCTION

The plaintiff in this suit seeks declaratory relief under 42 U.S.C. § 1983, for deprivation of rights secured by the Fourth and Fourteenth Amendments to the Constitution.[1] Specifically, she has instituted the present action seeking a declaration that the search of her purse and the University of Houston policy which authorizes this procedure are unconstitutional in that they require or permit searches without a warrant and without probable cause in violation of the Fourth Amendment. The sole issue confronting the Court in this case is the constitutionality of this search procedure at public events held in Jeppesen Stadium and Hofheinz Pavilion on the University of Houston campus. Jurisdiction of this Court is invoked under 28 U.S.C. § 1343(3) and (4).

This case was tried before Senior Judge Ben C. Connally on November 20, 1975. The parties agreed at that time that the only issue to be decided was the constitutional validity of the University of Hous-

ton's search policy at Jeppesen Stadium and Hofheinz Pavilion. After the brief hearing, and prior to any ruling on this issue, Judge Connally died, and this case was transferred to the docket of Judge Carl O. Bue, Jr. The parties have agreed that this Court may resolve the single question at issue in this case based on the record of trial, and all interrogatories and depositions on file.

## II. FACTS OF THE CASE

The facts material to this Court's ruling on the constitutionality of the University of Houston's written policy regarding searches at Hofheinz Pavilion and Jeppesen Stadium are undisputed.[2] In the fall of 1973 the plaintiff in this case was enrolled at the University of Houston and was serving as vice president of the student government. One evening in November of 1973, the plaintiff and three of her friends attended a rock concert at Hofheinz Pavilion, which has a seating capacity of 10,500. After entering the building and upon entering the doors of the pavilion the plaintiff was stopped by one Officer Bell, an employee of the University's Traffic and Security Department who was on duty that night. In her deposition the plaintiff submits that she was first asked whether she had any bottles or weapons in the large purse she was carrying. When she laughed and said no, Officer Bell purportedly grabbed her purse, whereupon she grabbed it back. Officer Bell then purportedly proceeded to seize the plaintiff's arm, take her into the lobby, threaten her with arrest for disorderly conduct and seize her purse. The plaintiff claims that the purse was then thoroughly searched, including the wallet and cigarette box contained therein. The plaintiff in her deposition estimated her purse to be about ten by twelve inches in size.

---

1. The plaintiff originally sought injunctive relief and damages in the amount of $10,000.00. In October of 1975 the University of Houston was dismissed as a party defendant. At trial, the plaintiff waived monetary damages, and in a post-trial stipulation parties agreed that the only matter to be determined was the validity of the University's written policy.

2. While the parties agree that the facts are largely undisputed, Officer Bell testified as the plaintiff's only witness for a few minutes during the brief hearing and contradicted some of the details of the precipitating event as described in the plaintiff's deposition. These disputed details are of no consequence to this Court's determination of the constitutionality of the University's written search policy, since the plaintiff has waived any personal damages.

On direct examination at trial, Officer Bell testified that he first instructed the plaintiff that he was going to search her purse "for alcoholic beverages, bottles, grass and weapons". He proceeded by holding the purse and then inspecting its contents after feeling what he thought to be a weapon. He denied the remaining indignities included in the plaintiff's version of the incident.

Officer Bell found nothing which was proscribed by school regulations in the purse, and it was returned to the plaintiff, who proceeded on into the concert. The plaintiff's three friends were not searched. Officer Bell testified that he arrested a Christianna Osuna later that same evening after searching her purse and finding marijuana. There is no evidence that any signs were posted around the pavilion giving notice of the University's policy of searching bags and parcels, or giving notice that bottles and cans were prohibited.

At trial the defendant Clifton Miller, who is currently the vice president of Facilities, Planning and Operations, testified. His job includes supervisory control of traffic and security of the University. At the time of the incident in question, Mr. Miller had been in office for a little over a month. The defendant testified that the policy of checking handbags and other packages of patrons entering Hofheinz Pavilion was an unwritten one which had originated some time prior to the plaintiff's episode. Shortly after this suit was filed in February of 1974, this policy was reduced to writing, as follows:

"To promote the health and safety of all those involved in any way with the special events held in Hofheinz Pavilion and Jeppesen Stadium the University has instituted the policy that alcoholic beverages and cans and bottles of any kind will not be permitted in either facility.

"The University Staff Counsel has advised that the University has the right to make and enforce this policy. The Staff Counsel has further advised that the way to enforce the policy without violation of the statutes regarding search is to not allow persons to enter either facility with containers, packages or bundles that could conceal alcoholic beverages, cans or bottles unless they are willing to let those packages and parcels or bundles be opened and examined to be sure that they do not contain such beverages or containers. If they do not wish such an examination to be made, the University is within its rights to refuse admittance. The principle involved is the same as that used in the examination of hand luggage before boarding aircraft.

"All should understand that this does not mean there is a wholesale license to require examination of all parcels and handbags but only those bags that could reasonably be of such size as to conceal bottles or cans."

It is undisputed that this written policy expressed the unwritten policy which was in effect at the time that the plaintiff was confronted by Officer Bell. Mr. Miller testified that he was unaware of any incidents prior to plaintiff's which precipitated the policy of searching for bottles and cans. He also indicated that it was his understanding that the searches authorized by the policy included pockets large enough to hold bottles or cans.

The defendants' only other witness was a Ms. Mary Voswinkel, who presently serves as the assistant director of Traffic and Security in the police department. She had served in the University's police force for over twenty years. In November of 1973 she was a University police officer. According to Ms. Voswinkel, the purpose of the policy was to provide safety and security for everyone in the pavilion. Some entertainers would request that patrons with bottles and cans be barred from the pavilion to avoid injury. For this reason neither canned nor bottled beverages were sold in the pavilion. She also testified that the floor of the pavilion was composed of a special synthetic material which could easily be damaged by bottles or cans used as projectiles; she credited the University's search policy for the very few injuries caused by bottles or cans thrown in the pavilion. Ms. Voswinkle also testified that

fewer searches would be made at a symphony than at a rock concert; the security measures taken would depend on the type of crowd expected.

■ For reasons which follow, the Court has concluded that the intrusions rendered permissible by the University's written search policy cannot withstand Fourth Amendment scrutiny.

## III. APPLICABLE EXCEPTIONS TO THE REQUIREMENT OF A WARRANT BASED ON PROBABLE CAUSE UNDER THE FOURTH AMENDMENT

■■ The Supreme Court has ruled on numerous occasions that the Fourth and Fourteenth Amendments render a search conducted without a warrant unreasonable *per se* "subject only to a few specifically established and well-delineated exceptions". *E. g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The creation or recognition of an exception to the "warrant-based-on-probable-cause" requirement is generally premised on a tripartite weighing of public necessity, efficacy of the search and degree of the intrusion. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (search based on consent); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop based on articulable suspicions and frisk for weapons); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1967) (regulatory inspection of premises of an establishment serving alcoholic beverages);[3] *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances of hot pursuit of an armed criminal suspect); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (search incident to a lawful arrest); *United States v. Newell,* 506 F.2d 401 (5th Cir. 1975) (border searches for contraband and illegal aliens); *United States v. Skipwith,* 482 F.2d 1272, 1275 (5th Cir. 1973); *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973) (airport searches for weapons and explosives); *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir. 1972) (search of briefcases and purses upon entering federal courthouse). These exceptions are well-defined and easily identified by specific factual circumstances.

■ The search policy *sub judice* requires neither an arrest nor hot pursuit; separate analysis of these exceptions is therefore not warranted. The Court is also of the opinion that "the difficult problem of effectively policing . . . national boundaries"[4] renders the border search exception sufficiently inapposite to justify a comparison with the searches here at issue. The Court has likewise concluded that the administrative searches authorized in *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1970), *Colonnade Catering Corp. v. United States, supra,* and *Camera v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), dealt with regulatory inspections of premises and are clearly distinguishable from the personal intrusions authorized by the University's search procedure.

The Court has concluded that none of the recognized exceptions to the warrant requirement can be adapted to the personal searches authorized by the written policy at

---

**3.** Although the Supreme Court in *Colonnade* recognized a right to demand a warrant prior to an inspection, it sanctioned the issuance of a warrant in this highly regulated industry on less than probable cause. *See also Camera v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

**4.** *Thomas v. United States,* 372 F.2d 252, 254 (5th Cir. 1967). Although the Fifth Circuit Court of Appeals has held that standards for initiating airport searches at the boarding gate

should be no more stringent than those applied in border searches, *United States v. Skipwith, supra,* 482 F.2d at 1274, the objectives of these different exceptions to the Fourth Amendment warrant requirement are wholly dissimilar. The objective of both airport searches and the searches under scrutiny in this case is sufficiently similar to warrant analysis of the airport search exception; both seek to avert dangers created by deviants which endanger a number of persons in a relatively confined area.

issue in this case. However, certain aspects of (A.) searches conducted at airports and courthouses, (B.) stop-and-frisk searches under *Terry v. Ohio, supra,* and (C.) searches legitimized by the implied consent of the citizen, are sufficiently analogous to justify separate consideration.

### A. Airport and Courthouse Searches

In the wake of unprecedented airport bombings, aircraft piracy and courtroom violence, the courts have approved precautionary security measures which cannot be reconciled with previously conceived notions of the citizen's protection under the Fourth Amendment against warrantless intrusions without probable cause. *E. g., United States v. Edwards,* 498 F.2d 496 (2d Cir. 1974) (airport); *United States v. Moreno, supra* (airport); *United States v. Bell,* 457 F.2d 1231 (5th Cir. 1972) (courthouse); *Downing v. Kunzig, supra* (courthouse); *People v. Clutchette,* No. 78302 (San Francisco County Super. Ct., March 27, 1972) (trial of the Soledad Brothers). *See also* Note, *The Constitutionality of Airport Searches,* 72 Mich.L.Rev. 118 (1973); K. Jessmore, *The Courthouse Search,* 21 U.C.L. A.L.Rev. 797 (1974). The tripartite considerations of (1) public necessity, (2) efficacy of the search, and (3) degree and nature of the intrusion, enunciated in *United States v. Skipwith, supra,* must be analyzed in order to compare the defendant's search procedure with search procedures which the courts have determined are constitutionally "reasonable" under the Fourth Amendment.

### 1. Public Necessity

■ The underlying purpose or objective sought in the implementation of a preventive search should be examined in light of the nature of the threat involved and the likelihood that the threat will materialize.

The nature of the threat necessitating airport and courtroom searches is death or serious injury to a number of citizens caused by inherently lethal weapons or bombs. In *Downing v. Kunzig, supra,* 454 F.2d at 1231, the Court took judicial notice of nationwide violence in the courtroom. An airplane hijacker might very well convert the plane itself into a weapon of mass destruction. *United States v. Albarado,* 495 F.2d 799, 805 (2d Cir. 1974). *See also United States v. Skipwith,* 482 F.2d 1272, 1275 (5th Cir. 1973) (" . . . there is a judicially-recognized necessity to insure that the potential harms of air piracy are foiled."). The courts have relaxed the strictures of the Fourth Amendment in light of the unprecedented violence experienced in these two public areas. In the present case the nature of the threat is injury posed by a can or bottle which might be thrown with resulting injuries. But unlike a bomb or other weapon considered in the courtroom or airport cases, cans and bottles have many proper uses, and it is only through their misuse that injury can result. The defendants' objective in seeking to prevent this misuse is unquestionably a valid one. But it is also quite clear that the dangers posed by the potential use of bottles and cans as projectiles pales in comparison to the dangers posed by a bomb or a gun used to facilitate a skyjacking or terrorize a courtroom.

In examining the governmental objective for a particular search procedure it is also important to note the likelihood that the feared injury or property damage will occur. Airport security and courthouse search procedures were implemented only recently in the wake of violence reported in these public areas around the country. In the present case the defendants produced absolutely no evidence of any history of disturbances or injuries caused by thrown cans or bottles before and after implementation of the search policy. Ms. Voswinkel testified that she was aware of very few injuries since the policy was invoked; she credited the policy with the relative success in injury prevention. Without specifying she further testified that she believed other educational institutions had experienced problems with bottles and cans, and the University of Houston was simply seeking to reduce the chance of similar mishaps. There is therefore at best only minimal evidence in this record on which this Court

can make a determination that a danger exists as a consequence of concealed bottles or cans being carried into Jeppesen Stadium or Hofheinz Pavilion.

### 2. The Efficacy of the Search

Somewhat related to the question of the probability of danger to the public is "the likelihood that the search procedure will be effective in averting the potential harm". *United States v. Skipwith,* 482 F.2d 1272, 1275 (5th Cir. 1973). The written policy here in question provides that entrance to Hofheinz Pavilion or Jeppesen Stadium will be conditioned on a search of any "containers, packages or bundles that could conceal alcoholic beverages, cans or bottles. . . ." Defendant Vice President Miller, testified that the policy included searches of large pockets, which "get to be a question of discretion". Certainly, in order to exclude effectively bottles and cans from these two facilities, it would be necessary to search large coat pockets. The record does not reflect how many security officials are employed at large public events at either Jeppesen Stadium or Hofheinz Pavilion, but it is at least questionable whether random searches of the many thousands of patrons could achieve the valid purpose of excluding the objectionable items covered by the written procedure. With regard to the exclusion of concealed "alcoholic beverages", the scope of the intrusion necessary to discover hidden flasks would render the task virtually insurmountable.

The same argument might be made by analogizing the futility of the courthouse search sanctioned in *Downing v. Kunzig, supra,* wherein only briefcases and parcels were subject to search. Anyone determined to thwart that procedure could very well secrete a miniature bomb or small pistol on his person and enter the courthouse undetected. If efficacy of the search were the only factor to be considered, the University's procedure would be difficult to distinguish from *Downing v. Kunzig.* For

reasons covered in Part III.A.1., *supra,* and Part III.A.3., *infra,* however, this Court has concluded that *Downing v. Kunzig* should be distinguished from the present case.[5]

The airport searches have generally entailed the implementation of two different techniques for detecting suspects. The first technique relied on is use of a Federal Aviation Administration anti-skyjack profile to narrow the number of potential "suspects". *See United States v. Skipwith, supra.* The anti-skyjack profile is the culmination of a detailed study conducted by the Federal Aviation Administration, and it serves to enumerate thoroughly those personal characteristics shared by previous skyjackers.

Generally, this justification for searching has been supported by additional suspicious behavior or bulges. *See United States v. Skipwith, supra,* 482 F.2d at 1277 (bulging pocket). At least one court has held that the search of the handbag of a person who fit the profile but had done nothing of a suspicious nature was invalid. *United States v. Ruiz-Estrella,* 481 F.2d 723 (2d Cir. 1973).

Many cases have upheld searches of profile suspects wherein the suspect also activated a magnetometer, which is the second screening technique widely used in airport searches. *United States v. Cyzewski,* 484 F.2d 509 (5th Cir. 1973); *United States v. Bell,* 464 F.2d 667 (2d Cir. 1972); *United States v. Slocum,* 464 F.2d 1180 (3d Cir. 1972). The magnetometer indiscriminately subjects all prospective passengers and carry-on baggage to a search to detect any unusual amount of metal, which might indicate the presence of a gun, knife or bomb. *See, e. g., United States v. Edwards, supra; United States v. Palazzo,* 488 F.2d 942 (5th Cir. 1974). This indiscriminate search of the general public has been troublesome from a standpoint of the Fourth Amendment, but it has generally received judicial sanction due to the "absolutely minimal invasion of privacy involved". *United States*

---

5. From a standpoint of efficacy, the searches conducted prior to entrance into the actual courtroom in *United States v. Bell, supra,* and *People v. Clutchette, supra,* are distinguishable from the University's procedure; those cases dealt with thorough searches of persons as well as effects, in which a relatively small number of people were involved.

*v. Albarado, supra,* 495 F.2d at 806. Moreover, "the overwhelming majority of weapons will respond to a magnetometer . .." *Id.* at 804. Therefore, unlike the questionable efficacy of the personal searches *sub judice,* the magnetometer's efficiency in detecting weapons has been established.[6]

### 3. The Degree and Nature of the Intrusion

The public need for searches under certain circumstances and the efficacy of the procedure chosen must be balanced by this Court's careful weighing of "the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails". *United States v. Skipwith, supra,* 482 F.2d at 1275. Unlike the administrative searches of premises sanctioned in *Camera v. Municipal Court, supra,* and *Colonnade Catering Corp. v. United States, supra,* the defendants' procedure entails a search of the person and his effects. In this respect this procedure is similar to airport and courthouse or courtroom searches. But unlike airport and courthouse searches, it is evident from the testimony at trial that the procedure here in question is not applied indiscriminately to all persons entering the respective facilities. Instead, the record reflects that the decision to search, as well as the degree of the ensuing search, are left entirely to the discretion of the searching guard.

One defendant, Vice President Miller, who supervises campus security, confirmed that the decision to search large pockets of a person's clothing was left to the guard's discretion, implying that some were inspected and some were not. Ms. Voswinkel from the University's security police testified that she presumed that fewer "containers" were searched at symphony concerts than at rock concerts. It is therefore apparent that the decision to search does not turn solely on whether a given handbag or pocket could contain a bottle or can. While

those searched may fall into the definable class of all persons with a pocket or a container of a certain size, the evidence indicates that only certain members of that class are singled out and actually searched.

The court in *Downing v. Kunzig, supra,* 454 F.2d at 1232, quoting the trial court noted that "all persons entering the Federal Building," were searched. The magnetometer searches conducted at airports indiscriminately subject every prospective passenger and his carry-on baggage to a search for unusual quantities of metal. In neither of these situations does a stigma attach to embarrass the party subjected to the security measure. Although searches conducted pursuant to the FAA anti-skyjack profile arguably do not apply indiscriminately to all potential airline passengers, this profile is the product of a thorough compilation of data, and the official who conducts the search applies specific criteria in his decision to investigate further. Moreover, the Court is unaware of any case upholding a search based solely on the FAA suspect profile. Contrarywise, in this case each security officer operating under the University's search procedure is required to apply his own individualized standards in determining which large pockets or purses to search. While such criteria based on the searching officer's experience can justify a search in some contexts, *see Terry v. Ohio, supra,* 392 U.S. at 30, 88 S.Ct. 1868, the nature of the intrusions *sub judice* cannot be compared with the nature of the indiscriminate airport and courthouse searches. For reasons which follow in the next section of this opinion, the rationale of searches sanctioned in *Terry v. Ohio* has no application to the searches under scrutiny herein.

### B. Terry v. Ohio and the Stop and Frisk

In *Terry v. Ohio,* and in all of the airport searches cited herein the question confronting the court was the admissibility of evidence in a criminal trial, rather than the

---

**6.** In *United States v. Albarado,* the court cited FAA Office of Air Transportation Security, Hijacking Attempts on U.S. Registered Aircraft (October 5, 1973), and noted that from a peak of 33 successful skyjacking attempts in 1969, the number declined dramatically to 10 in 1972, and none in 1973. 495 F.2d at 804. The Court is unaware of any similar statistics regarding courthouse searches.

constitutionality of the search itself. But, as the Supreme Court in *Terry* noted, "[a] ruling admitting evidence in a criminal trial . . . has the necessary effect of legitimizing the conduct which produced the evidence". 392 U.S. at 13, 88 S.Ct. at 1875. Courts confronted with the troublesome problem of reconciling airport searches with the judicial gloss of the Fourth Amendment have relied on the "stop-and-frisk" doctrine sanctioned by the Supreme Court in *Terry*.[7]

■■■ *Terry* applied a flexible standard of reasonableness to searches conducted in street encounters between police and citizens, rather than the more rigid test of probable cause.

> "Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

392 U.S. at 30, 88 S.Ct. at 1884. Thus, while the individual discretion of an experienced police officer can be a valid factor in determining the reasonableness of a search, this discretion is not unfettered, and no search can be justified on the basis of mere "inarticulate hunches". 392 U.S. at 22, 88 S.Ct. 1868. Moreover, the searching officer conducting a *Terry* "stop-and-frisk" need not establish probable cause, but he still must be able "to point to specific and articulable facts which, taken together with rational inferences [drawn] from those facts [would] reasonably warrant [the] intrusion." 392 U.S. at 21, 88 S.Ct. at 1880.

Viewed from the standpoint of the level of suspicion necessary to constitutionally justify a search, *Terry* noticeably relaxed the traditional requirement that probable cause be shown. Articulable suspicions that

a person was "armed and presently dangerous" were held sufficient to warrant a "severe . . . annoying, frightening, and perhaps humiliating [intrusion] . . . ." 392 U.S. at 24–25, 88 S.Ct. at 1882. As applied to courthouses and airline terminals, the indiscriminate searches of everyone entering such facilities are characterized by a significant reduction in the burden that *Terry* imposes on the searching officer to establish by articulable facts the basis for his suspicion.

■■■ The searches in the present case are not indiscriminate. Unlike the *Terry* searches, they are conducted without any definitive basis for suspicion; but like the *Terry* searches, they constitute serious intrusions which can be both annoying and humiliating. Unlike any of the searches considered in the "stop-and-frisk" cases, or in the airport and courthouse context, the policy at issue in this case is not limited to searches for inherently lethal weapons. Rather, it seeks to exclude items which could pose a danger to the public only if misused. This Court does not read *Terry v. Ohio* to sanction wholesale searches of the general public in the absence of exigent circumstances, regardless of the searching official's valid interest in preventing potential injuries. *See United States v. Davis*, 482 F.2d 893, 906 (9th Cir. 1973).

### C. Implied Consent

■■■ It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent". *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973), *citing Davis v. United States*, 328 U.S. 582, 593–594, 66 S.Ct. 1256, 90 L.Ed. 1453 (1945). The defendants cite three cases for the rule applied in other jurisdictions that "one who approaches the airport check-in counter with the obvious intention of boarding the plane impliedly consents to a search by the airline employees.[8] It is significant to note

---

7. *See, e. g., United States v. Legato*, 480 F.2d 408 (5th Cir. 1973), *cert. denied*, 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973); *United States v. Moreno*, 475 F.2d 44 (5th Cir. 1973).

8. *United States v. Miner*, 484 F.2d 1075 (9th Cir. 1973); *United States v. Dalpiaz*, 494 F.2d 374 (6th Cir. 1974); *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973). The court in *United*

that none of the cited cases upheld the search in question on the basis of the consent of the party searched, although the Ninth Circuit recognized that consent to an airport search could be implied. The Court is aware of no Fifth Circuit Court of Appeals decisions wherein an airport search procedure has been upheld on the basis of implied consent.[9] The Court has concluded that the policy in issue in this case cannot escape the sweep of the Fourth Amendment on the ground that it predicates all intrusions made on the actual or implied consent of prospective patrons.

First, if public access to Hofheinz Pavilion or Jeppesen Stadium is conditioned on submission to a search, that submission would be coerced and hence not consensual. *See United States v. Albarado*, 495 F.2d 799, 806–807 (2d Cir. 1974). Moreover, the Supreme Court has ruled that:

"[T]he rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the

grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *United States v. Chicago, Milwaukee, St. Paul, & Pacific Railroad Co.*, 282 U.S. 311, 328–29, 51 S.Ct. 159, 164, 75 L.Ed. 359 (1931).

Secondly, the Supreme Court in *Terry v. Ohio, supra*, 392 U.S. at 16, 88 S.Ct. 1868, made it quite clear that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person". Therefore, in order to legitimize the defendants' written policy on the grounds that it conditions any search on the consent of the party searched, the defendants must establish that both the initial detention at the door and the subsequent search for proscribed items were based on consent. Nothing in the evidence indicates that any signs were ever posted or are presently posted near the entrances to Hofheinz Pavilion or Jeppesen Stadium setting out the University's policy of stopping and searching patrons for bottles, cans, or alcoholic beverages.[10] Even if defendants could

---

*States v. Dalpiaz* upheld the validity of the search in question, but on the basis of *Terry v. Ohio* and not on the basis of the criminal defendant's consent. 482 F.2d at 377. *But see United States v. Edwards*, 498 F.2d 496, 505 (2d Cir. 1971) (concurring opinion).

**9.** In *United States v. Legato*, 480 F.2d 408, 410 (5th Cir. 1973), *cert. denied*, 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973), the Fifth Circuit held that consent was an alternative ground for upholding the admission into evidence of heroin seized at an airport terminal. However, this consent was not implied from the acts of the defendant in seeking to board an aircraft. Rather, it was based on the statement: "Sure go ahead and open it. It's only a coffee percolator. It's for a friend of mine." This statement was made after a *Miranda* warning had been given.

Arguably, any search based on the doctrine of implied consent violates the requirement that "[t]he government must show a consent that is 'unequivocal and specific', . . ." *Judd v. United States*, 89 U.S.App.D.C. 64, 190 F.2d 649, 651 (1951). Implying consent to an otherwise unconstitutional search on the basis of the acts of a citizen would be appropriate only if those acts were unequivocal and specific. While it is clear that the government need not show that the party knew that consent could be freely withheld, *United States v. Garcia*, 496 F.2d 670 (5th Cir. 1974), the Supreme Court in

*Schneckloth v. Bustamonte*, 412 U.S. 218, 248–249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), clearly preserves this awareness as one factor to be considered in determining whether the consent was voluntarily given. In *Schneckloth* the court upheld a search based on a verbal consent.

**10.** Nor for that matter is there any indication from the record of this suit that there was any notice that these items were prohibited in the respective premises. The two Ninth Circuit opinions cited by the defendants as authority for the application of the implied consent doctrine in the context of airport searches emphasized that the many conspicuous signs outlining the search procedures prior to entering an aircraft clearly established knowledge of the security searches on the part of anyone who advanced to the boarding stage. *United States v. Miner*, 484 F.2d 1075, 1076 (9th Cir. 1973); *United States v. Davis*, 482 F.2d 893, 914 (9th Cir., 1973). Again, both of these opinions held that the searches in question were invalid and consent had not been established. *See also Downing v. Kunzig, supra*. Although this Court need not here decide, the presence of conspicuous signs at the entrances of Hofheinz Pavilion and Jeppesen Stadium might well justify a carefully limited search of persons who persist in carrying large containers into these facilities. Obviously a proven history of distur-

constitutionally condition entrance on the relinquishment of the right of patrons to be free from unreasonable searches, it is clear from the face of the written policy in question that verbal consent is not sought until after the patron is initially "seized".

## IV. CONCLUSION

The objective of the University of Houston's search procedure to exclude alcoholic beverages, and any cans or bottles from Jeppesen Stadium and Hofheinz Pavilion is an undeniably valid one. In an effort to contend with the realities of a society wherein a notorious few often subject the public to the threat of violence and injury, the defendants in this case have sought to enforce a policy of conditioning admittance to these two public forums on a personal search for concealed and prohibited items. No doubt wholesale searches of every person entering Hofheinz Pavilion or Jeppesen Stadium could reduce the number of injuries occurring in those two facilities. But no court has ever approved a dragnet search of citizens based upon the justification that the danger of criminal conduct would be reduced, even in high crime areas where incidents of violence occur quite frequently. *United States v. Skipwith, supra*, 482 F.2d at 1275, n. 4. The defendants have not produced any evidence of a similar policy in effect anywhere else in the country; yet the administrative concern in preventing injury in large public stadiums is certainly not confined to the University of Houston. This Court has concluded that neither the recognized exceptions to the Fourth Amendment "warrant-based-on-probable-cause" requirement, nor the balancing test of reasonableness applied in carving out those exceptions can validate the broad, random intrusions authorized by the search procedure here in question.

This conclusion is reached solely on the basis of the written policy at issue in this case and the testimony at trial relating to the application of that policy. This opinion does not preclude any searches which can be justified on the basis of recognized exceptions. This Court is confronted with a written policy, and no more. Under the University's present policy, the size of the container is the sole criterion applied in determining whether or not to conduct a search. The Court is not confronted with the question of whether university officials may detain or search patrons who manifest a more substantial justification than pockets, packages or handbags large enough to contain a bottle or can. The breadth of the intrusions authorized by the University's policy is aptly illustrated by the testimony of Officer Bell on the stand.

Q. "When you stopped [the plaintiff], what did you say to her?"

A. "As Miss Collier approached me, I told her that I was going to examine her purse for alcoholic beverages, bottles, grass and weapons."

While the written policy clearly would not condone this procedure, the absence of any specific and limiting guidelines in the policy vests the searching officer with an impermissibly broad power to invade the rights of the public to be free from unreasonable searches.

For reasons stated herein, the University of Houston's search policy at Hofheinz Pavilion and Jeppesen Stadium, as written, is determined by this Court to violate the Fourth Amendment.[11] Although the plaintiff in her complaint initially sought injunctive and monetary relief, at trial and in a post-trial stipulation she has maintained that the only relief sought was a determination of the constitutionality of

---

bances, a factor completely absent in the instant case, would do much to underscore the need for an adequate search procedure.

11. The defendants do not argue in their brief that a different Fourth Amendment standard should apply to schools, nor would this Court find such an argument meritorious. Although the University's interest in the well-being of its

students is undoubtedly a factor to be considered in the "reasonableness" of a search under the Fourth Amendment, students do not "shed their constitutional rights . . . at the schoolhouse gate". *Tinker v. Des Moines School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). *See also Smyth v. Lubbers*, 398 F.Supp. 777 (W.D.Mich.1975).

the written policy. Therefore, no permanent injunction will issue.