Paul **CHENKIN**, Plaintiff,

v.

**BELLEVUE HOSPITAL CENTER, NEW YORK CITY HEALTH & HOSPITALS CORPORATION and Anne P. Ryan, in her official capacity as Director of Personnel Management of the New York City Health & Hospitals Corporation, Defendants.**

No. 79 Civ. 1672.

United States District Court,
S. D. New York.

Sept. 20, 1979.

Eugene N. Harley, Jeremiah S. Gutman, Levy, Gutman, Goldberg & Kaplan, Richard Emery, New York Civil Liberties Union, New York City, for plaintiff.

Allen G. Schwartz, Corp. Counsel, New York City, for defendants; Joseph F. Bruno, Susan R. Rosenberg, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action challenges the legality of a regulation issued by a large urban municipal hospital in an effort to prevent or reduce pilferage of hospital property, whereby bags, packages and large parcels carried by employees leaving the hospital are subject to random spot inspection. The question for decision is whether such inspections are violative of the Fourth Amendment, made applicable to the States through the Fourteenth Amendment.[1]

Plaintiff is an assistant chemist employed by Bellevue Hospital Center ("Bellevue"). He instituted this action for a declaratory judgment that Bellevue's "pilferage con-

---

1. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

trol-package pass system" (the "package control system," or "the system") is unconstitutional, and to enjoin its continued enforcement. In addition, he seeks reimbursement for one week's lost wages, which amount was deducted from his salary after a hearing officer had determined that he was "insubordinate" in willfully failing to comply with the requirements of the package control system. The defendants contend that the system is fair and reasonable and a valid condition of employment, and, therefore, that it is constitutional.

The material questions of fact are undisputed. The parties agree that the matter is ripe for summary judgment disposition and that the sole issue for determination is the constitutionality of the package control system.

Bellevue is a municipal medical complex of enormous size. It is the largest municipal hospital in Manhattan and the second largest in the City of New York. It covers four entire city blocks, stretching from 26th to 30th Streets and from First Avenue to the East River. It employs approximately 5,600 people and has 22 exits through which those employees, as well as visitors, may leave.

In March 1978, Bellevue officials determined to stem what they perceived to be a rising tide of pilferage of hospital property including, but not limited to, medical equipment, sheets, towels, flatware and foodstuffs, all of which were readily available throughout the hospital. Accordingly, on March 17, 1978, they issued a memorandum that was posted on elevators, corridors, walls and various departments and laboratories throughout the hospital announcing the adoption of the package control system effective on April 3, 1978. Under the system employees leaving the hospital with packages may be asked by guards of the hospital's security division to permit inspection of those packages. The system requires all staff and employees carrying "shopping bags, brown paper bags, boxes, tote bags, wrapped packages, suitcases, etc." when leaving the hospital to use either of two designated exits. At each of these exits security guards are intermittently placed and are authorized at random intervals to stop persons carrying parcels from the hospital and to inspect those parcels for the sole purpose of determining whether they contain pilfered hospital property. Because of the volume of the traffic in and out of the facility, and the limited size of the security force, not all persons carrying such packages are stopped. Instead, the officers randomly select packages for inspection. Persons whose packages are selected are required to open them and exhibit their contents. When packages are inspected only a minimal examination is undertaken. The security guards making these inspections are not authorized to confiscate personal property or examine personal papers, and there is no claim that they ever did so. Nor do they ever conduct "frisks" or "pat downs" or any other contact searches. Moreover, women's pocketbooks are never inspected.

An important feature of the system announced at its inception is an alternative procedure whereby employees may entirely avoid having their packages searched. Upon entering the hospital those who wish to do so may "check" their packages at one of three locations where they are stored until the owner is ready to leave the building. Checked packages are not inspected at any time. Thus, hospital personnel who avail themselves of this procedure may enter and leave without having their packages inspected by anyone.

Bellevue maintains that the system reduces the amount of pilferage of hospital property in two ways: it provides a means of detecting theft of hospital property and constitutes a general deterrent to those who might otherwise be inclined to pilfer hospital property. While no precise statistical data has been submitted, Bellevue's officers swear that pilferers have been apprehended on "numerous occasions" since the system was implemented and that the system has been an effective deterrent.

The origin of the present controversy stems from an incident on June 28, 1978, when security guards stopped the plaintiff Chenkin while he was on his way out of the

hospital and attempted to inspect the contents of the knapsack he was carrying with him. The officers chose Mr. Chenkin's bag at random as the object of their search; it is undisputed that they had no probable cause to believe, or even an articulable suspicion supporting an inference, that plaintiff's bag in particular contained any hospital property. The plaintiff has never denied that he had received due notice of the existence of the regulation, which included notice of the availability of the alternate procedure. In the absence of such a denial, it may be assumed that at the time of the incident, he was aware of the package control system, which had already been in effect for more than twelve weeks.[2]

When asked by security guards to exhibit the contents of his knapsack, plaintiff refused to do so. Upon presenting his identification to a security guard, his name was noted, and he was permitted to leave the hospital without being searched. No immediate action was taken against plaintiff as a result of this incident.[3]

On July 14, 1978, security guards again stopped plaintiff while he was leaving the building. Again, the stop was made randomly, as part of the "spot-check" program. No suspicion of unauthorized activity was directed at plaintiff; nor is there any evidence that the security guards who stopped him on the second occasion remembered him from the first. A scenario ensued similar to that which had transpired on the first

occasion. The guards requested that the plaintiff open his knapsack, and he refused. His name was once more taken, and he was allowed to leave with his bag uninspected. Plaintiff was never subjected to any coercion, physical or mental abuse.[4]

Following the second incident, the plaintiff was summarily suspended without pay for a five-day period, from July 24 to July 28, 1978, for his refusal to comply with "instructions for inspection of bags [he was] carrying out of the hospital." Thereafter and pursuant to New York law, a hearing was conducted on October 5, 1978, before a neutral hearing officer.[5] Plaintiff appeared, with counsel, and testified on his own behalf. The only issue raised in defense of plaintiff's conduct was the claim that the system was unconstitutional. The hearing officer found that the plaintiff had "knowingly violate[d], after due notice, an official regulation of the Corporation and therefor[e] is guilty of insubordination."[6] He found the package control system to be a "fair and reasonable means of coping with [the] serious problem" of pilferage, and "a reasonable condition of employment."[7] He recommended that the suspension of plaintiff for five days without pay be upheld. After a final appeal, the recommendation of the hearing officer was accepted and implemented; the penalty was imposed by Bellevue's Director of Personnel Management, who is named in her official capacity as a defendant in this suit.

2. Plaintiff does claim, however, that at the time of the incident, he was unaware that those who failed to comply with the security regulations were subject to fines or even dismissal from employment. The only notice that clearly prescribed the penalties for failure to comply was posted for the first time on July 20, or *after* plaintiff had been stopped. Nevertheless, the language of the original notice is clearly obligatory. Employees were informed, beginning on April 3, that security was regarded as "everyone's responsibility"; that the package control system "require[d] full cooperation for its success"; and that "[c]ompliance with this procedure is essential." In light of these statements, it may be assumed that plaintiff realized that these directives, if valid, were enforceable by appropriate sanctions, including fines.

3. The June 28 incident, however, was mentioned in the letter of reprimand sent by Belle-

vue to the plaintiff after his second failure to comply. It is not clear whether the hospital would have taken disciplinary action against the plaintiff had he subsequently chosen to comply. It is, of course, clear beyond question that the plaintiff had actual notice of the hospital's policy as a result of the June 28 incident.

4. Pretrial Order Item 4.

5. *See* New York Civil Service Law § 75 (McKinney's 1973). Plaintiff raises no claim that the hearing violated his right to due process, or any other procedural rights.

6. In the Matter of Chenkin, slip op. at 5 (Green, hearing officer).

7. *Id.*

Upon these facts the plaintiff claims that, as a matter of law, Bellevue's policy is violative of the Fourth Amendment to the United States Constitution. He claims that the system authorized unreasonable intrusions into his privacy, that are made without compelling justification and that achieve no discernible reduction of pilferage. With equal vigor Bellevue asserts that employees have no reasonable expectation of privacy in the packages they bring to work; that, when viewed in the totality of circumstances, its regulation is reasonable; and that in any event the plaintiff impliedly consented to be searched. Each of these contentions will be examined in turn.

## A. The Plaintiff's Expectation of Privacy

Counsel for the parties cite leading Supreme Court cases in support of their respective positions, but none of these is dispositive of the issues here presented.[8] While those cases give direction to the general principles to be applied when an issue is raised as to whether a particular action constitutes a "search" within the meaning of the Fourth Amendment, and if so, whether it is "reasonable," each case must turn on its own individual facts. Thus, we turn to an examination of each of the parties' contentions.

■ The plaintiff's essential contention, no matter how conceptualized, is that the hospital's policy of subjecting the contents of his bag to inspection, upon his leaving the place of his employment, constitutes an invasion of his right of privacy. He relies principally upon the "lodestar"[9] case, *Katz v. United States*,[10] in which the Supreme Court held that the Fourth Amendment protects people, not places, from unreasonable intrusions into their privacy by the government.[11] However, subsequent decisions have made clear that not all privacy interests which a person asserts are constitutionally protected. As the Court recently reiterated: "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifia-

---

**8.** Some of the cases cited are quite wide of the mark. For example, much of the argument in the briefs concerns whether the decision to stop a particular individual for inspection of his bag should be made by a neutral hearing officer, and whether it should be supported by probable cause. Not only would the requirements of a warrant and probable cause be unworkable in this context, but they are singularly inappropriate in situations in which the authorities have no suspicion that a particular individual has engaged in wrongful conduct. As the Supreme Court has said:

In analyzing the issue of reasonableness *vel non*, the courts have not sought to determine whether a protective inventory was justified by "probable cause." The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures. . . . The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative care-taking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.

*South Dakota v. Opperman*, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976). *See also United States v. Chadwick*, 433 U.S. 1, 10 n. 5, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977) ("[T]he salutary functions of a search warrant simply have no application in [this] context; the constitutional reasonable-

ness of inventory searches must be determined on other bases.")

Equally inapplicable is that line of cases, cited by the parties, requiring government regulatory agencies to obtain warrants before inspecting places of employment for safety hazards, *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), or commercial buildings and dwellings for fire and health code violations. *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The violations that the government sought to uncover in those cases involved fixed conditions, existing in a confined area and unchanged over a period of time long enough to permit government agents to make the requisite showing of need before a neutral hearing officer. The instant case involves manifestly different conditions. Any requirement that Bellevue's security officers appear in front of a neutral officer before making inspections would emasculate the hospital's efforts to control pilferage.

**9.** *Smith v. Maryland*, —— U.S. ——, ——, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

**10.** 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**11.** *See also United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

ble,' a 'reasonable,' or 'legitimate expectation of privacy' that has been invaded by government action." [12] This, in turn, involves a dual inquiry into whether the individual's conduct evinces an actual, subjective expectation of privacy; and second, whether that expectation, when viewed objectively, is justifiable under the circumstances.[13]

Here it may be acknowledged that the plaintiff entertained an expectation of privacy with respect to his belongings contained within his bag. By his conduct in refusing to permit an inspection of his bag, he has "exhibited an actual (subjective) expectation of privacy" [14] and has shown that he "seeks to preserve [its contents] as private." [15]

Plaintiff's belief cannot be dismissed as wholly unreasonable. The item that he asserts is protected—a closed bag, containing personal effects, and carried on his person—is the type of item that traditionally has been accorded protection under the Fourth Amendment.[16] Numerous cases have recognized a legitimate expectation of privacy in objects not nearly so intimately connected with the individual's person as are the contents of a knapsack carried on the back.[17] Certainly the plaintiff did not lose that protection in that he did not "knowingly expose [ ] to the public" [18] the contents of his bag. Nor did he relinquish control over his bag, or release its contents into the public domain. He took affirmative steps to shield the bag's contents from public view and to protect their privacy.[19]

█ Nevertheless, Bellevue claims that plaintiff's subjective belief was unreason-

---

**12.** *Smith v. Maryland*, —— U.S. ——, ——, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

**13.** *See United States v. Katz*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

**14.** *Id.* (Harlan, J., concurring).

**15.** *Id.* at 351, 88 S.Ct. at 511.

It is instructive to consider the entire passage in context:

[The] effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351–52, 88 S.Ct. at 511 (footnote omitted).

**16.** *Cf. United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (privacy interest in the contents of a footlocker).

**17.** *See, e. g., Michigan v. Tyler*, 436 U.S. 499, 505, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (privacy interest inheres even in an abandoned, fire-gutted building); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (a footlocker carried in an automobile); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed. 2d 854 (1973) (contents of the trunk of an automobile); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (objects left in an office shared by two individuals); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (the contents of conversations held in a public telephone booth); *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1878) (mail); *United States v. Speights*, 557 F.2d 362 (3d Cir. 1977) (objects left in a locker at the place of employment); *United States v. Leonard*, 524 F.2d 1076 (2d Cir. 1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976) (contents of sealed envelope sent through mails are protected; information on outside cover is not); *United States v. Durkin*, 335 F.Supp. 922 (S.D.N.Y. 1971) (contents of rented public locker protected).

**18.** *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**19.** By contrast, whenever a person does knowingly expose some object or item to the public, he loses his privacy interest in it and forfeits the right to invoke the protection of the Fourth Amendment. *See, e. g., Smith v. Maryland*, —— U.S. ——, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (no privacy interest in the list of numbers that a person dials on the telephone, because those numbers are routinely revealed to the telephone company); *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (the information on the face of negotiable instruments, which is recorded at a bank); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 781, 35 L.Ed.2d 67 (1973) (the character and quality of one's voice, which is necessarily within the public domain); *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d

able. It points to the gigantic size of the institution and the enormous number of people who traverse its portals daily; from these facts, it contends that the hospital was so "public" in character that no one in it could reasonably expect to enjoy the benefits of privacy. But this argument, if accepted, would strip individuals who ventured from their homes of most of the protection of the Fourth Amendment.[20] The Fourth Amendment protects people, both in their homes and in public places.[21] Indeed, even when people venture into areas which, for compelling reasons, are accorded a lesser degree of Fourth Amendment protection, such as airport lobbies, they still retain some justifiable expectation of privacy in their belongings.[22]

Bellevue also contends that the warning posters it displayed announcing the package control system apprised employees that they could not justifiably harbor subjective expectations of privacy in the contents of the packages they carried into the building. That argument, however, is also unavailing. The mere announcement by Bellevue that packages are subject to search is not enough either to change the plaintiff's expectations or to legitimate the inspection system. If this argument were accepted, the government and quasi-public institutions would gain broad power to refashion the contours of the Fourth Amendment merely by proclamation. Plainly, this is not the case,[23] and no court has so held.

■ We hold that the plaintiff exhibited an actual, subjective expectation of privacy in his bag and in its contents, and that that expectation was not rendered unreasonable either by the size and public character of the hospital or by the announcement of the hospital's inspection policy. These conclusions, however, are not the end of the inquiry. The crucial question is whether the plaintiff's expectations, viewed objectively, were "reasonable" in light of the hospital's interest in controlling pilferage.

### B. Reasonableness

■ It is axiomatic that the Fourth Amendment forbids only those warrantless searches deemed "unreasonable." The process of determining which particular searches are forbidden requires a balancing of "the public interest against the Fourth Amendment interest of the individual."[24] Three factors are crucial to that analysis: the strength of the public necessity for the search; the efficacy of the search; and the degree and nature of the intrusion upon the individual.[25] On the basis of these factors,

548 (1973) (statements and records sent to an accountant for analysis); *United States v. Hoffa*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (statements made to a confederate in crime); *United States v. Leonard*, 524 F.2d 1076 (2d Cir. 1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976) (information, including addresses, appearing on the outside of envelopes sent through the mail); *United States v. Shelby*, 573 F.2d 971 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978) (trash left outside a house for collection).

20. *Cf. Delaware v. Prouse*, 440 U.S. 662, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979):
   Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra*, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

21. *See* notes 15 and 20 *supra*.

22. *United States v. Moreno*, 475 F.2d 44 (5th Cir.), *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973). *Cf. United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974) (search at airport boarding gate).

23. *See, e. g., Smith v. Maryland*, —— U.S. ——, —— n. 5, 99 S.Ct. 2577, n. 5, 61 L.Ed.2d 220 (1979).

24. *United States v. Martinez-Fuerte*, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). *See also Delaware v. Prouse*, 440 U.S. 648, 654 nn. 6, 8, 99 S.Ct. 1391, 1396 nn. 6, 8, 59 L.Ed.2d 660 (1979) (citing cases).

25. *See, e. g., United States v. Albarado*, 495 F.2d 799, 805 (2d Cir. 1974); *United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973); *Wheaton v. Hagan*, 435 F.Supp. 1134, 1144 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. 1357, 1362 (S.D.Tex.1976).

plaintiff seeks to distinguish his case from those cases involving "unique circumstances,"[26] such as searches conducted at airport boarding gates or at the courthouse doors,[27] in which the courts have relaxed the strictures of the Fourth Amendment in order to protect the public from the threat of grave physical harm. Plaintiff argues that, by comparison, the situation at Bellevue required no extraordinary measures. The argument has some force. Certainly the harm to the public occasioned by even rampant pilferage of public property, though not insignificant, is not on the same scale as that posed by airport terrorism. There is dramatic evidence, as well, that airport and courthouse searches have effectively curtailed the danger against which they are directed. Nonetheless, the comparison that plaintiff offers proves only that in the airport and courthouse cases, the balance of interests points more strongly in favor of the public interest than it does in the case at bar; those cases are not dispositive.

Plaintiff also urges that this case is directly analogous to those "public arena" cases, in which courts have struck down search procedures instituted at the entrance to public events, particularly rock music concerts, for the purposes of apprehending suspected drug offenders and controlling the flow of dangerous projectiles into the performance area.[28] Those cases also rest upon their own particular facts. In them the courts made clear that, although the dangers of drug abuse and of public riot were real, the means adopted by the authorities to check these dangers were large-ly ineffectual. More importantly, the tactics employed, which were directed principally against minors, created an atmosphere of fear and coercion.[29] The concert patrons were "grabbed" without warning by police officers.[30] They were subjected to intrusive and humiliating searches, including "pat-downs" of their garments, and searches of their pockets, coats, shirttails, and pocketbooks.[31] Moreover, they were given either inadequate warning, or no warning at all, of the possibility of a search. Nor were they informed of their right to refuse the search and to have their ticket money refunded. In these circumstances, where the public interest is only moderate, the searches are degrading and largely ineffectual, and the victims are often uninformed minors, the courts have appropriately concluded that such security measures are unreasonable.

The facts of the instant case are discernibly different. Although not overwhelming, the public's interest in controlling pilferage from public institutions is nevertheless substantial and legitimate. The problem is fueled by Bellevue's sheer size. With hospital personnel concerned essentially with the ill and the maimed, as they should be, protection of hospital property becomes increasingly difficult. The aggregate value of property lost through theft in a facility as large as Bellevue, employing 5,600 people and utilized by countless visitors is likely to be substantial, and the cost is borne by the community. According to the uncontested affidavits of hospital personnel, the measures adopted by Bellevue have served to

**26.** *United States v. Skipwith*, 482 F.2d 1272, 1274 (5th Cir. 1973).

**27.** *Id.* (airport searches); *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir. 1972) (courthouse searches).

**28.** *Gaioni v. Folmar*, 460 F.Supp. 10 (M.D.Ala. 1978); *Stroeber v. Commission Veteran's Auditorium*, 453 F.Supp. 926 (S.D.Iowa 1977); *Wheaton v. Hagan*, 435 F.Supp. 1134 (M.D.N.C. 1977); *Collier v. Miller*, 414 F.Supp. 1357 (S.D. Tex.1976).

**29.** *See, e. g., Gaioni v. Folmar*, 460 F.Supp. 10, 12, 15 (M.D.Ala.1978) (the Civic Center had been "converted . . . into an armed camp" *Id.* at 15) (citation omitted); *Wheaton v. Hagan*, 435 F.Supp. 1134, 1141 (M.D.N.C.1977).

**30.** *Gaioni v. Folmar*, 460 F.Supp. 10, 12 (M.D. Ala.1978); *Collier v. Miller*, 414 F.Supp. 1357, 1359 (S.D.Tex.1976).

**31.** *Gaioni v. Folmar*, 460 F.Supp. 10, 12 (M.D. Ala.1978); *Stroeber v. Commission Veteran's Auditorium*, 453 F.Supp. 926, 930 (S.D.Iowa 1977); *Wheaton v. Hagan*, 435 F.Supp. 1134, 1141 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. 1357, 1359–60 (S.D.Tex.1976).

alleviate the problem. In other words, the searches have been efficacious.

Moreover, the search tactics adopted at Bellevue are reasonable. The hospital's methods have none of the coercive and offensive impact of those used at rock concerts. Plaintiff was forewarned of the possibility of a search, and thus was not intimidated by the element of surprise. He was an adult employee, familiar with the area in which he was stopped. He was not "grabbed" by the security guards; indeed, no one attempted either to touch or to search his person. Because he was chosen at random, he was not stigmatized by the suspicion of wrongdoing. The scope of the intended search was limited by the sole objective of locating unauthorized hospital property; there is no indication that the searching officers were looking for, or intended to confiscate any other property, even if illicit, that their search might have revealed. No compulsion or threats were invoked, even after the plaintiff refused to comply with the officers' request. Upon identifying himself, the plaintiff was permitted to leave without undergoing any inspection. The intrusion contemplated by the inspection policy would have been minimal, and the examination, brief. It has not been suggested, and cannot be contended, that any other, less restrictive measures could have been utilized to accomplish the hospital's purposes. If firms trading on the stock exchange may require their employees to submit to fingerprinting in an effort to curb the problem of thievery,[32] no reason appears why hospitals functioning in the public interest should not be permitted the lesser intrusion caused by inspection of bags.

The reasonableness of the hospital's package control system is underscored by the availability of the alternative procedure.[33] It would have been a simple matter, that in no way would have inconvenienced him, for plaintiff to have checked his bag upon entry into the building; he thereby would have avoided all risk of a random spot check. He freely chose not to pursue this alternative; instead, he insisted and continues to insist, upon a right to carry his bag into the building without accepting the concomitant obligation of submitting its contents to an appropriate examination when requested to do so.

After viewing the totality of the circumstances and balancing all of the aforementioned factors, it is this Court's considered judgment that the package control system adopted by Bellevue Hospital Center constitutes a fair, reasonable, and minimally intrusive method of efficaciously coping with a serious public problem. Accordingly, it is not prohibited by the Fourth Amendment.[34]

---

**32.** See *Thom v. New York Stock Exchange*, 306 F.Supp. 1002 (S.D.N.Y.1969) *aff'd sub nom Miller v. New York Stock Exchange*, 425 F.2d 1074 (2d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), in which this Court upheld New York State's requirement that all employees of member firms trading on national security exchanges submit a set of their fingerprints to law enforcement authorities as a condition of employment. In upholding the measure, the Court cited the state's "legitimate concern with the problem of ever-mounting thefts in the industry," and its "power to take reasonable steps to prevent or reduce theft." *Id.* at 1006. Compelling employees to submit fingerprints involved "[no] stigma or any implication of criminality," *id.* at 1007, and only "slight inconvenience to employees." *Id.* at 1006. Accordingly, the Court rejected as "without substance" the "[p]laintiffs' contention that fingerprinting is an affront to their dignity and an invasion of their privacy." *Id.* at 1007.

**33.** In two of the cases upon which the plaintiff most heavily relies, the courts have stated, in dicta, that they would have upheld security systems similar to the one used at Bellevue, provided that the systems were adequately publicized and that they offered some means, such as the use of a "check room," by which people could avoid having their packages inspected. See *Wheaton v. Hagan*, 435 F.Supp. 1134, 1148 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. 1357, 1366 n.10 (S.D.Tex.1976).

**34.** The Supreme Court's recent decision in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), does not dictate a contrary result. In *Prouse* the Court held that the government's legitimate objective of promoting highway safety was advanced only "marginal[ly] at best" by the practice of discretionary spot checks of vehicles in order to determine whether their drivers were properly licensed. *Id.* at 660, 99 S.Ct. 1391. Other, more effective means were available to the government to

■ Plaintiff has raised two other arguments that require brief attention. First, he contends that the hospital's policy violates the principle of equal protection because it expressly exempts women's pocketbooks from the inspection requirement. If the heart of this claim is that the system accords women an undeserved exemption, then this constitutes a benefit, not a detriment, and the claim does not state a cause of action. On the other hand, if plaintiff is contending that Bellevue's system irrationally classifies pocketbooks as different from knapsacks, we hold that Bellevue might rationally conclude both that pilfered items could more readily be concealed in a knapsack than in a pocketbook, and that a search into the former would be less intrusive than one into the latter. Finally, the policy reflects a sensitivity for Fourth Amendment rights and underscores the reasonableness of the regulation.

■ Furthermore, plaintiff urges that even though he was informed about the system, the general public who visit the hospital are not adequately informed about it, and thus, the searches are unreasonable at least with respect to them. Plaintiff, however, has no standing to assert claims on behalf of other employees, and even less with respect to claims that might be raised by the general public. In any event, nothing has been presented on this motion as to an inspection of the property of any persons other than employees.

Bellevue has also urged us to conclude that by his actions plaintiff has impliedly consented to the inspection policy. In light of our disposition of the other issues, it is unnecessary to reach this contention.

The motion of the defendant Bellevue Hospital Center for summary judgment is granted.

promote that end. *Id.* Moreover, the Court stressed the "physical and psychological intrusion" visited upon unsuspecting drivers by these kind of stops in particular, in which the "possibly unsettling show of authority" by police officers could "create substantial anxiety" among innocent riders. *Id.* After balancing the harm against the public good, the Court invalidated random inspection stops on the highways. Upon these facts, it is clear that the balance of harm and benefit in *Prouse* is significantly different from that in the case at bar.