**Magno J. ORTEGA, Plaintiff-Appellant,**

v.

**Dennis M. O'CONNOR, Executive Director, Napa State Hospital; Richard Friday, Business Manager, Napa State Hospital, Dorothy Owen, Personnel Officer, Napa State Hospital; Stefan Donoviel, etc., et al., Defendants-Appellees.**

No. 84–2169.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 11, 1985.

Decided June 27, 1985.

---

Gilbert T. Graham, San Francisco, Cal., for plaintiff-appellant.

Teresa Tan, Deputy Atty. Gen., San Francisco, Cal., for defendants-appellees.

Before SCHROEDER, NELSON and REINHARDT, Circuit Judges.

NELSON, Circuit Judge:

Magno Ortega appeals the district court's grant of summary judgment against him in an action alleging claims under 42 U.S.C. § 1983 and state law. We reverse and remand with respect to Ortega's section 1983 claim and affirm the grant of summary judgment against Ortega on his pendent state claims.

## FACTS AND PROCEDURAL HISTORY

Ortega, a state licensed physician and psychiatrist, held the position of Chief of Professional Education at Napa State Hospital ("Napa"), a public institution operated and owned by the State of California. In July 1981, Ortega became the subject of an investigation into the management practices of his department. Dennis O'Connor, Executive Director of Napa, asked Ortega to take vacation leave during the investiga-tion and not to return without O'Connor's written approval. Upon expiration of Orte-ga's vacation, O'Connor placed Ortega on administrative leave pending completion of the investigation. The investigation con-cerned the propriety of the acquisition of a computer and sexual harassment charges.

On August 17, 1981, a hospital staff member informed O'Connor that Ortega had told his secretary that he had taken the computer to his home. O'Connor apparent-ly believed that the computer belonged to the hospital, though in fact, Ortega had acquired the computer with his own funds and with funds donated by resident physi-cians. Although Ortega routinely took the computer home over weekends, O'Connor became concerned and directed four hospi-tal officials to enter Ortega's office and investigate the matter.

Upon entering Ortega's office, the inves-tigating officials attempted to sort through the items that they found, which included many of Ortega's personal belongings and papers. The officials took some of the items for use in the ongoing investigation of Ortega. The lock on the door to Orte-ga's office was changed, and Napa person-nel eventually removed the items from the office for storage in a special locked area, where they were available for Ortega to pick them up.

The office, located on Napa's campus, had been assigned to Ortega in his capacity as Chief of Professional Education. Orte-ga had occupied the office for seventeen years and his name was on the door. He alleged that he kept the office locked at all times when he was not in it and was the only person who had a key. Ortega be-lieved that no one else had ever entered his office without his permission during his tenure. Napa contends that the investigat-ing officials believed that the computer was state property and that they believed that state records and files in Ortega's office needed protection. The computer, how-ever, was not kept in Ortega's private of-fice, but in an adjacent room, and the state records and files were located in the secre-taries' office.

Napa contends that established hospital policy was to inventory property in the offices of departing or terminated employees to determine which property was state property and which was personal. At the time the officials entered his office, however, Ortega had neither been terminated nor was he scheduled to depart: he was merely on administrative leave pending completion of the investigation. Nothing in the record suggests that inventory procedures were conducted on a regular basis. Ortega, furthermore, was never informed that his office could be entered at any time and investigated. The investigation subsequently led to Ortega's termination in October 1981.

Ortega thereafter filed this section 1983 action alleging violation of his fourth amendment right to be free from unreasonable governmental intrusion. He also attached pendent state claims for invasion of privacy and breach of covenant of good faith and fair dealings. Prior to trial, both Ortega and the state defendants moved for summary judgment. The district court granted the defendants' motion, concluding that the search was reasonable under the fourth amendment and that the state causes of action were barred by Ortega's failure to comply with the California Torts Claims Act.

## DISCUSSION

### (a) Standard of Review

We review the district court's grant of summary judgment de novo to determine whether, viewing the facts in the light most favorable to the nonmoving party, there is any genuine issue of material fact and whether the substantive law was correctly applied. *Greenfield v. Kootenai County,* 752 F.2d 1387, 1388 (9th Cir.1985).

### (b) Section 1983 Claim

Ortega's section 1983 claim is grounded in the fourth amendment protections against unreasonable searches and seizures. The ability to invoke those protections depends "not upon a property right in the invaded place but [upon] whether the area was such that there was a reasonable expectation of freedom from government intrusion." *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Not all privacy interests asserted are constitutionally protected, however. *See United States v. Roberts,* 747 F.2d 537 (9th Cir.1984). Fourth amendment privacy analysis involves both a subjective and an objective component: a party invoking fourth amendment protection must have a subjective expectation of privacy and society must be prepared to recognize and protect such an expectation as reasonable. *See United States v. Pollock,* 726 F.2d 1456, 1465 (9th Cir.1984); *United States v. Bunkers,* 521 F.2d 1217, 1219 (9th Cir.), *cert. denied,* 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975).

As the Chief of Professional Education, Ortega dealt routinely with medical residents and professional staff. He worked in an office secured by a locked door, with a desk containing personal papers and files.[1] Furthermore, as a physician and psychiatrist, Ortega possessed sensitive and confidential information about patients or people with whom he dealt. In the seventeen years that Ortega occupied the office, the office had never been entered without his permission. Office inventories were apparently reserved for employees who were departing or were terminated. When Ortega's office was searched, he was neither scheduled to de-

---

1. Ortega claims the following were searched and seized by Napa:
   (a) Purely personal correspondence from friends and family.
   (b) Photographs of friends, acquaintances, and family.
   (c) Medical files and correspondence from private patients unconnected to Napa State Hospital.
   (d) Appointment books and personal notes, as well as official appointments.
   (e) Personal financial records and accounts.
   (f) A file approximately 18 feet long of IBM cards containing teaching aids and notes.
   (g) Personal souvenirs, gifts and presents belonging to Ortega.
   (h) Copyrighted manuscript.

part nor had he been terminated. These facts suggest that Ortega had a subjective expectation of privacy in his office that society is prepared to recognize and protect as reasonable. *See Bunkers,* 521 F.2d at 1219; *cf. Mancusi v. DeForte,* 392 U.S. 364, 368–69, 88 S.Ct. 2120, 2123–24, 20 L.Ed.2d 1154 (1968) (union official, even though he shared office, was entitled to expect that records would not be taken from his office without his permission).

In *Gillard v. Schmidt,* 579 F.2d 825, 829 (3d Cir.1978), the Third Circuit, confronting a similar situation, held that a school guidance counselor had a reasonable expectation of privacy in his desk. *Gillard* involved a search of a guidance counselor's desk, which was located in one large room that had been partitioned into five smaller offices. 579 F.2d at 826. The court's finding of a reasonable expectation of privacy rested, in part, on the sensitive nature of information likely to be found in a guidance counselor's files. 579 F.2d 828.[2] Here, Ortega's office possessed even more indicia of an expectation of privacy than did the desk in *Gillard:* Ortega's name was on the door; the office was kept locked and Ortega believed he possessed the only key; Ortega had occupied the office for seventeen years; and no policy provided for inspections of employees' offices. Ortega's office, moreover, was likely to contain sensitive and confidential information about Ortega's patients, as well as personnel files. *See also United States v. Speights,* 557 F.2d 362, 363 (3d Cir.1977) (police officer had reasonable expectation of privacy in police-issued locker secured by police lock and personal lock, even though locker was owned by police department and supplied primarily for storage of police equipment).[3]

The circumstances of Ortega's case are distinguishable from those in decisions finding no objective expectation of privacy in the workplace, because Napa had no general inspection policy. In *United States v. Bunkers,* 521 F.2d 1217 (9th Cir. 1975), for example, a postal employee could claim no objective expectation of privacy in a locker because well-publicized regulations informed postal employees that lockers were subject to search as part of an effort to combat pilferage and stealing. *Id.* at 1219. Similarly, in *United States v. Collins,* 349 F.2d 863 (2d Cir.1965), *cert. denied,* 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966), the court upheld a search of a Customs service employee's jacket for a stolen emerald where Customs employees were aware of the possibility of searches and where such searches occurred regularly. 349 F.2d at 867–68. *See also Chenkin v. Bellevue Hospital Center, New York City Health & Hospitals Corporation,* 479 F.Supp. 207 (S.D.N.Y.1979) (hospital's publicized policy of random inspection of parcels at hospital exits, designed to control pilferage, did not violate fourth amendment).

Here, Napa had never instituted surveillance or searches and had no general inspection policy that might have defeated Ortega's expectation of privacy in his office. The entry into the office seems to have been for no other purpose than to secure evidence for use in the ongoing investigation of Ortega. We therefore reject

---

**2.** The motivation for the search of Ortega's office is distinguishable from that in *Gillard,* which was the result of an angered school board member's desire to ascertain the authorship of political cartoons in a newspaper. 579 F.2d at 826. The search of Ortega's desk was apparently motivated by concern with the whereabouts of a computer and by the impending investigation of Ortega. We do not believe, however, that any distinctions that can be made between the motivations behind these two searches are relevant when determining the reasonableness of Ortega's expectation of privacy.

**3.** Napa's efforts to distinguish *Gillard v. Schmidt,* 579 F.2d 825 (3d Cir.1978), and *United States v. Speights,* 557 F.2d 362 (3d Cir.1977), by characterizing the search of Ortega's office as a routine administrative search are unpersuasive. It is clear that Ortega was still a Napa employee when his office was searched, and there is no evidence in the record showing that Ortega knew of any policy providing for inspection of his office.

Napa's contention that Ortega's expectation of privacy in his office was unreasonable.[4] We conclude that the search of Ortega's office was not a reasonable search under the fourth amendment.

The record in this case justifies a grant of partial summary judgment for Ortega on the issue of liability for an unlawful search; we will therefore remand to the district court for an entry of judgment in favor of Ortega and for a hearing to determine the amount of damages. *See Gillard v. Schmidt,* 579 F.2d 825, 829 (3d Cir.1978); *see also International Longshoremen's & Warehousemen's Union v. Kuntz,* 334 F.2d 165, 171 (9th Cir.1964).

(c) Pendent Claims

■ Ortega urges this court to accept his assertion that his pendent state claims should be excused from meeting the requirements of the California Torts Claims Act. The applicable statutes condition the right to sue the state upon timely filing of claims. This court has held that failure to comply with state-imposed procedural conditions to sue the state bars the maintenance of a cause of action based upon these pendent state claims. *See Willis v. Reddin,* 418 F.2d 702, 704 (9th Cir.1969). Cal. Gov't Code § 905.2 states that a claim must be presented for "all claims for money or damages against the state," including claims for "money damages (1) on express contract, or (2) for an injury for which the state is liable" in accordance with the code. Ortega failed to file a claim with the State Board of Control as required by Cal.Gov't Code § 905.2 and his claim is now barred by the statute of limitations. Cal.Gov't Code §§ 911.2, 911.4. Ortega is therefore barred from pursuing his state-law claims.

CONCLUSION

We affirm the grant of summary judgment against Ortega on his pendent claims

and reverse and remand with instructions to grant Ortega summary judgment and determine damages on his section 1983 claim.

---

**4.** Napa's reliance on *Williams v. Collins,* 728 F.2d 721 (5th Cir.1984), for the proposition that Ortega had no expectation of privacy in his office is unjustified. *Williams* is not relevant to our inquiry here, because it considered only

whether the defendants had exceeded their authority and thereby lost their statutory immunity; it did not address fourth amendment requirements.