Richard G. GAIONI, Michal Norton, Jerry Schiver, all Individually and as representatives of the class, Plaintiffs,

v.

Emory FOLMAR, Individually and in his capacity as Mayor of the City of Montgomery, Alabama, Alvan Gillem, Individually and as Public Safety Director of the City of Montgomery, Alabama, Charles Swindall, Individually and as Chief of Police for the City of Montgomery, Alabama, Defendants.

Civ. A. No. 78-1-N.

United States District Court,
M. D. Alabama, N. D.

May 9, 1978.

John L. Carroll, Morris S. Dees, Jr., and Howard A. Mandell, Montgomery, Ala., for plaintiffs; Leon Capouano, Stephen Ellmann, J. Doyle Fuller, Thomas T. Gallion, III, Richard A. Lawrence, J. Paul Lowery, Benjamin Pool, Frank Riggs, Robert D. Segall, and Donald Watkins, Montgomery, Ala., of counsel.

Robert C. Black, Hill, Hill, Carter, Franco, Cole & Black, and Randall C. Morgan, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

This class action [1] brought pursuant to 42 U.S.C. § 1983 by named plaintiffs Richard G. Gaioni, Michal Norton and Jerry Schiver challenges the constitutionality of random, warrantless searches of persons attending the Charlie Daniels' concert at the Montgomery Civic Center on December 29, 1977. Defendants are Emory Folmar, mayor of the City of Montgomery; Alvan Gillem, Public Safety Director for the City of Montgomery; and Charles Swindall, Montgomery's Chief of Police. Jurisdiction is based on 28 U.S.C. § 1331 and § 1343(3). The action was tried before this Court on February 13, 1978,[2] and is now submitted for resolution on its merits. Incorporated in this memorandum opinion are the appropriate findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

In December, 1976, the City of Montgomery opened its Civic Center, a municipally owned, financed and operated facility designed to accommodate various public events, such as church group meetings, private balls, wrestling matches, and music concerts. According to the testimony of defendants and some of their witnesses, rock music concerts, unlike other events, have been characterized by illegal use of marijuana and alcohol by some spectators attending the concerts; this has resulted in a number of citizen complaints to defendants. In response to the complaints, defendants have acted to curb the use of

---

1. At the time of the trial, the exact definition of the plaintiff class had not yet been determined. This Court now, pursuant to Rule 23(c), Federal Rules of Civil Procedure, certifies that the plaintiff class includes all persons who have been or may be searched without a warrant and without probable cause (as that term has been defined by the United States Courts) as those persons seek to attend and/or as a condition to attending public events in the City of Montgomery, Alabama.

2. Although the February 13 hearing was initially set for consideration of plaintiffs' motion for preliminary injunction, the case was tried on the merits by stipulation of the parties.

drugs and alcohol at rock concerts, taking such steps as increasing the size of the security force, halting sale of beer, and posting no smoking signs. None of these steps have been successful.

The decision to take action not normally taken at other Civic Center functions was made shortly after Mayor Folmar and Chief Swindall attended a rock concert on November 26, 1977. The mayor ordered Swindall and Gillem to formulate a plan to stop drug and alcohol consumption at future rock concerts. Swindall recommended "massive arrests" on the floor of the Civic Center. Gillem, while endorsing Swindall's plan, recommended, in addition, "a good shakedown at the door" to stop the flow of illegal substances into the building.[3] Gillem's recommendation was adopted by Mayor Folmar.[4]

The shakedown plan was put into effect at the Charlie Daniels' concert on the night of December 27, 1977. A force of 49 police officers, including six members of the strike force, was dispatched to the Civic Center.[5] Twelve to fifteen officers were stationed in the immediate vicinity of the entrances. As patrons passed through the turnstiles, many were stopped by police.[6] Citizens—both male and female—were ordered to open their coats, pocket bulges were patted down, inside pockets were examined and the contents of pocketbooks were inspected. As a result of the searches, twenty-two adults were arrested for drug related offenses and twenty juveniles were arrested for possession of marijuana and alcohol.

Examples of testimony from plaintiffs and their witnesses illustrate the manner in which the searches were conducted. Richard Gaioni was grabbed by two police officers immediately after emerging from the turnstiles with his wife. One of the officers bent Gaioni's wrist behind his back while his pockets were searched. Gaioni was later treated for wrist strain. Plaintiff Jerry Schiver observed a friend in front of him approach a police officer and open his coat. Believing he was required to do so, Schiver also opened his coat for the officer, who ran his hand under Schiver's coat, front and back, and patted down Schiver's pockets. Feeling two sheet metal screws in one of Schiver's pockets, the officer directed him to step aside, at which time he saw plaintiff was wearing a belt buckle device resembling a pipe.[7] Schiver then was ordered to remove his belt, taken to a separate room, further searched, interrogated, and released. Teri Nichols had her pocketbook seized by a policewoman, who acted without asking Ms. Nichols for her consent. The pocketbook was thoroughly searched. In a small, side compartment, the policewoman found one marijuana cigarette. Ms. Nichols subsequently was charged with possession of marijuana.

Plaintiffs filed this lawsuit on January 3, 1978, seeking a declaration that the policy of conducting random searches at rock concerts adopted by defendants[8] infringes their rights guaranteed by the First, Fourth, and Fourteenth Amendments. Plaintiffs further request that this Court enjoin such searches at future public events

3. Memorandum from A. Gillem to C. Swindall (Dec. 5, 1977); Deposition of Emory Folmar.

4. The decision adopting the plan to conduct massive searches at the Civic Center evidently was made without consulting the city attorneys about the legality of their plan. Deposition of Emory Folmar; Deposition of Alvan Gillem.

5. In addition, at least one officer with a police dog was in the immediate vicinity of the Civic Center while the searches were taking place.

6. About sixty to seventy percent of the people who entered the Civic Center were searched. The decision of who was searched and the manner in which each search was conducted

was committed to the discretion of the individual police officers.

7. Although the device was capable of being used to smoke marijuana, it had never been so used.

8. Defendants assert they have not adopted such a policy, contending instead that the search plan implemented on the night of December 27, 1977, was a "one-time" incident. Yet, defendants decline to rule out the possibility they will conduct similar searches in the future. In the absence of such assurances, this Court must assume that the searches will continue.

in Montgomery. Finally, plaintiffs ask that defendar.s be required to "expunge or destroy any memoranda, records, notes or any other documents which were made as a result of the searches . . . which refer in any way to the plaintiffs or any member of the class they represent who were not arrested." In response, defendants claim that the search policy is a reasonable and constitutional response to the problems posed by drug and alcohol use at rock concerts.

■ It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is "*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *E. g. Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Since the searches at issue in this case were conducted without warrants issued upon probable cause, they can pass constitutional muster only if it is shown they fall within one of those exceptions.[9] The burden is on the defendants to

make such a showing. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ Defendants attempt to fit the Civic Center searches within two of the exceptions to the warrant based on probable cause requirement.[10] First, defendants analogize the searches to those made for weapons and explosives at airports, which have received judicial approval. *E. g. United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973); *United States v. Moreno*, 475 F.2d 44 (5th Cir.) *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973). The airport searches, however, are justifiable only because of certain "unique circumstances," such as the enormous potential for violence in an airplane bombing or hijacking and the necessity of discovering the plot before overt action is taken. *Id.* These circumstances are not present in this case. Defendants do not contend the searches were instituted to uncover weapons or other instruments of mass violence. Indeed, violence inside the Civic Center has never been

9. Defendants argue that the searches, in fact, were supported by probable cause because of "[t]he history of disturbances and flagrant violations of law [at rock concerts], the fact that police felt there was more likelihood of patrons bringing in contraband at rock concerts than other events, [and] the truckload of contraband that had been brought in at other rock concerts." Defendants' Post-Trial Brief at 15. This argument displays a complete misunderstanding of the concept of probable cause. Probable cause exists only when articulable facts and circumstances indicate *a particular individual* has committed or is committing a criminal offense. The fact that a person belongs to a class, such as concert goers, which contains some members who violate the law does not create probable cause to search that person. Cf. *United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973) ("no court has ever approved a dragnet search of all citizens in a high-crime area of any urban center, based upon the justification that the danger of criminal conduct would be reduced.") To hold otherwise, authorizing what plaintiffs term "probable cause by association," would permit authorities arbitrarily to subject citizens to search and thus emasculate the Fourth Amendment.

10. In *Collier v. Miller*, 414 F.Supp. 1357 (S.D. Tex.1976), which considered the constitutionality of a search policy similar to that of the

defendants, the court listed the following narrowly limited exceptions: *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (search based on consent); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop based on articulable suspicions and frisk for weapons); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1967) (regulatory inspection of premises of an establishment serving alcoholic beverages); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances of hot pursuit of an armed criminal suspect); *Beck v. Ohio*, 379 U.S. 89, 89 S.Ct. 223, 13 L.Ed.2d 142 (search incident to a lawful arrest); *United States v. Newell*, 506 F.2d 401 (5th Cir. 1975) (border searches for contraband and illegal aliens); *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973) (airport searches for weapons and explosives); *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir. 1972) (search of briefcases and purses upon entering federal courthouse). The court concluded that none could be adapted to the searches at issue in that case. 414 F.Supp. at 1361; see also *Wheaton v. Hagan*, 435 F.Supp. 1134 (M.D.N.C.1977). Similarly, this Court is of the opinion none of the exceptions are applicable to the searches at issue in this case.

a problem at rock concerts.[11] Rather, the defendants' searches are designed to seize drugs and alcohol, which, although sometimes illegal, present no public danger equivalent to that posed by a bomb or gun. See *Wheaton v. Hagan*, 435 F.Supp. 1134 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. 1357 (S.D.Tex.1976). Accordingly, the necessity for the Civic Center searches is minimal compared to that for airport searches.

Even if the necessity for the Civic Center searches was greater than was reflected by the evidence in this case, they still could not be analogized to the airport searches, since, in addition to necessity, two other factors— the effectiveness of the searches and the degree of intrusion they entailed—must also be considered. See *United States v. Skipwith, supra; Collier v. Miller, supra*. The evidence reflects that the Civic Center searches were very intrusive and not very effective. Although defendants did seize some contraband, drug and alcohol use at the Charlie Daniels' concert was not eliminated.[12] Airport searches, on the other hand, are highly effective. They usually are conducted with magnometers, which detect the "overwhelming majority" of items searched for, and, consequently, have caused a dramatic decline in the number of hijackings and bombings. *United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974). In addition, airport searches involve minimal invasion of privacy.

■ A second exception to the general ban on searches conducted without warrants issued on probable cause permits a search if the subject voluntarily consents.

*Schneckloth v. Bustamonte, supra.* Whether consent is voluntary is an issue of fact determined in light of the "totality of circumstances." *Id.* Defendants have the burden of proving that consent was freely and voluntarily given. See *Schneckloth v. Bustamonte, supra; Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Defendants contend the Civic Center searches fall within this exception because signs were posted at the entrances warning patrons they were liable to be searched.[13] The simple answer to this contention is that defendants cannot condition public access to the Civic Center on submission to a search and then claim those subjected to the searches voluntarily consented. *Cf. United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359 (1931) (cited in *Collier v. Miller, supra*) ("[T]he rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution.") Any consent obtained under such circumstances was an inherent product of coercion, since people undoubtedly felt if they refused to be searched they would forfeit their right to attend the concert. *Collier v. Miller, supra; see United States v. Albarado, supra*.

■ Even if, consistent with the Constitution, entrance to the Civic Center could be so conditioned, the searches still cannot be justified under the consent exception since defendants have not sustained their burden of proving that plaintiffs voluntari-

---

11. Deposition of Alvan Gillem; Deposition of James Foster; Deposition of L. A. Pierce; Trial testimony of Charles Kinsaul.

12. In a memorandum to Sergeant J. D. Foster dated December 30, 1977, Officer David Green stated:

It was obvious to [Detective] Laing and myself that even with concert goers being searched upon entering the Civic Center that there were numerous drug and alcohol violations that went undetected and a large amount of contraband that got past the searches at the door.

See Deposition of Emory Folmar; Deposition of J. D. Foster.

13. The signs read:

NOTICE
PERSONS ENTERING THE
MONTGOMERY CIVIC CENTER
AND THEIR
POSSESSIONS
ARE
SUBJECT
TO
SEARCH

NO ALCOHOLIC BEVERAGES OR ITEMS IN VIOLATION OF THE ALA. CONTROLLED SUBSTANCES ACT ARE ALLOWED.

ly consented to be searched.[14] The atmosphere a⁺ the Civic Center was hardly conducive to people making a free and unconstrained choice whether to allow themselves to be searched. Upon entering, patrons were confronted with a large force of police officers, armed and in uniform, which possessed apparent authority to conduct the searches. The presence of strike force officers enhanced the intimidating effect, conveying, in the words of defendant Gillem, "the impression that we [had] just converted the Civic Center into an armed Camp."[15] The evidence further reflects that many concert goers did not know they could refuse to be searched; nor were those who knew of their right to refuse given an opportunity to do so. Thus, based on the totality of circumstances, it cannot be concluded that those subjected to the Civic Center searches consented thereto.

 Since defendants have failed to demonstrate that the Civic Center searches fall within any of the permissible exceptions to the requirement that searches be conducted only pursuant to warrants issued on probable cause, this Court must and does now conclude that the policy of searching patrons at rock concerts as adopted and implemented by the defendant officials of the City of Montgomery, Alabama, violates the Fourth Amendment of the United States Constitution.[16] Accordingly, defendants will be enjoined from conducting similar searches or implementing such a search policy in the future. Moreover, in order to protect plaintiffs from any unjustified harmful stigma, defendants will be directed to expunge from their documents and records of the searches the name of any member of the plaintiff class who was not arrested for an offense discovered during the searches on the night of December 27, 1977.

In reaching its decision, the Court gives credence to defendants' proof that extensive violations of drug and alcoholic bever-

age laws occur at rock concerts, as well as at other public entertainment events in Montgomery. It should be emphasized that nothing in this opinion should be considered as a restraint on the police to arrest those violating the laws or to conduct searches on probable cause as that term is defined by the decisions of the United States Courts. Further, the Court acknowledges that some public events are difficult to police. The fact an event is difficult to police, however, does not authorize defendants to engage in illegal enforcement measures such as the wholesale, warrantless searches conducted at the Civic Center on the occasion in question. If an event cannot be policed in a manner that comports with the Constitution, it should not be sponsored by the City of Montgomery.

An appropriate order will be entered.

---

**14.** Defendants' reliance on the warning signs is misplaced. Voluntary consent cannot be implied solely from the presence of such signs, especially since many patrons never saw them. Of course, the presence of the signs must be and has been considered in evaluating the totality of the circumstances.

**15.** Deposition of Alvan Gillem.

**16.** It, therefore, is unnecessary to reach plaintiffs' claims based on the First and Fourteenth Amendments.