**Fred RINGE and Brenda Ringe**

v.

**James ROMERO, et al.**

**Civ. A. No. 84–2135 "L".**

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Dec. 23, 1985.

William P. Quigley, and Jane Johnson, New Orleans, La., for plaintiffs, the American Civil Liberties Union Foundation of La.

Gregory K. Morous, Lafayette, La., for defendants, James Romero and Dudley Lastrapes.

Thomas R. Duplantier, Lafayette, La., for defendant Don Breaux.

**MEMORANDUM RULING**

DUHE, District Judge.

Plaintiffs seek by summary judgment a declaration that LSA–R.S. 14:95.4(A) and Lafayette Ordinance 0–2271, codified as §§ 10–74 through 10–74.6, are unconstitutional both facially and as applied to plaintiffs in the instant case.

BACKGROUND

On February 10, 1984, plaintiffs were customers at Rod's Wammer-Jammer Motorcycle Shop, Bar and Lounge ("Uncle Rod's"). At that time more than ten police officers from the City of Lafayette and the Lafayette Parish Sheriff's Department entered Uncle Rod's to conduct a search of all Uncle Rod's patrons. Some were in uniform, others were in suits. Guard dogs were stationed with officers at the entrance to prevent customers from leaving.

The officers unplugged the jukebox and ordered the men to stand on one side of the room and the women on the other. Some of the officers then took the men to the hallway, one by one, and conducted personal searches. Fred Ringe was taken into the hallway and ordered to stand against the wall in preparation for a search. When Mr. Ringe asked an officer for a warrant, the officer said that one was not necessary. Mr. Ringe then placed himself against the wall. An officer, using his feet, forced Mr. Ringe's legs apart, and Mr. Ringe was "patted-down" for weapons. The officers confiscated his pocket knife. His wallet was also searched. Mr. Ringe was then photographed and told to step to an area where the others who had been searched earlier were standing. A police computer check was done on Mr. Ringe's driver's license.

Sometime after her husband was searched, Brenda Ringe was taken into the hallway. She was told to stand against the wall. When Mrs. Ringe questioned the propriety of this order, she was pushed against the wall by a female officer. This officer, using her feet, forced Mrs. Ringe's legs apart and proceeded to "pat-down" Mrs. Ringe, which included unfastening Mrs. Ringe's bra and shaking it, apparently until the officer was satisfied that the garment contained no weapons. Mrs. Ringe was also told to remove her boots and they

were searched. The officer then searched Mrs. Ringe's wallet and jacket and threw them to the ground. No weapons were found on her. Mrs. Ringe was photographed and allowed to rejoin her husband.

The plaintiffs and the other patrons of Uncle Rod's were detained for a total of approximately three hours during which the searches of approximately forty-four individuals were conducted. No one was allowed to leave until all the searches were completed. There was apparently no sign in or outside of Uncle Rod's informing individuals that their entrance into Uncle Rod's constituted consent to be searched by officials from the sheriff and police departments.

Fred Ringe was searched by C.J. Dartez, Jim Kraft and Roger Punac of the Lafayette City Police Department and Linda Spencer of the Lafayette Parish Sheriff's Office. Brenda Ringe was searched by Kim LeBlanc and Linda Spencer of the Lafayette Parish Sheriff's Department. All of the defendants, except James Romero, Don Breaux and Dudley Lastrapes, actually participated in the search of Uncle Rod's.

The defendants contend that the officers' authority for the search is 14 La.Rev.Stat. Ann. 95.4(A) (West Supp.1985) and Lafayette, La., Code of Ordinances §§ 10–74 through 10–74.6 (Supp.1982). The search revealed nine knives and one handgun, which were confiscated. No arrests resulted from the search. Uncle Rod's had been the setting for several incidents of violence involving weapons prior to the evening of February 10, 1984.

DISCUSSION

I. THE FACIAL CONSTITUTIONALTTY OF LSA–R.S. 14:95.4(A) AND LAFAYETTE CITY ORDINANCE §§ 10–74 THROUGH 10–74.6

Louisiana Revised Statute 14:95.4(A) provides:

Any person entering an alcoholic beverage outlet as defined herein, by the fact of such entering, shall be deemed to have consented to a reasonable search of his person for any firearm by a law enforcement officer or other person vested with police power, without the necessity of a warrant.

La.Rev.Stat.Ann. § 14:95.4 (West Supp. 1985).

Lafayette City Ordinance Section 10–74.2 provides:

Any sheriff, deputy sheriff, state police, city police, constables, town marshalls, or persons vested with police power, may search any persons found in any place where alcoholic beverages are sold and consumed on the premises, and shall confiscate any firearm or other instrumentality customarily used or intended for probable use as a dangerous weapon, which such police officer may find. This search shall be limited to weapons only, unless probable cause for a wider search is authorized.

Any person who enters a place where alcoholic beverages are sold and consumed on the premises does, by the mere fact of entering, consents to the search of his person for any firearm or other instrumentality customarily used or intended for probable use as a dangerous weapon, while on said premises, by any sheriff, deputy sheriff, state police, city police, constable, town marshall or persons vested with police power, without a warrant.

Lafayette, La., Code of Ordinances § 10–74.2 (Supp.1982).

Plaintiffs claim that the above statute and ordinance violate their right to be secure from unreasonable searches and seizures as protected by the Fourth Amendment of the United States Constitution. The fundamental purpose of the fourth amendment's prohibition against unreasonable searches and seizures " 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' " *New Jersey v. T.L.O.,* —— U.S. ——, 105 S.Ct. 733, 736, 740, 83 L.Ed.2d 720 (1985) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)). The protections of the fourth amendment apply

to all forms of "governmental action," — U.S. at ——, 105 S.Ct. at 740, as long as " 'the person invoking [fourth amendment] protection can claim a "justifiable," a "reasonable" or a "legitimate expectation of privacy" that has been invaded by [that] government action.' " *Hudson v. Palmer,* 468 U.S. 517, ——, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984) (quoting *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)).

The Supreme Court has consistently held that police must, whenever practicable, obtain advance judicial approval of a proposed search by obtaining a warrant based on probable cause. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). A search conducted without a warrant is unreasonable *per se* "subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The exceptions to the warrant requirement remain limited in scope, and the Supreme Court has been openly reluctant to expand upon them. *See United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The exceptions include: (i) border searches for contraband and illegal aliens, *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); (ii) hot pursuit of an armed criminal suspect, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); (iii) search incident to a lawful arrest, *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); (iv) stop based on articulable suspicions and frisk for weapons, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); (v) airport searches for weapons and explosives, *United States v. Davis,* 482 F.2d 893, 910 (9th Cir.1973); *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); (vi) searches upon entering courthouse, *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir.1972); (vii) search based upon consent, *Schneckloth v. Busta-*

*monte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); (viii) regulatory inspections pursuant to a statutory scheme, *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

Pursuant to the fourteenth amendment, the fourth amendment prohibition against unreasonable searches is applicable to state action. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This court must therefore determine whether the warrantless searches authorized by the laws in the instant case fit within one of the few exceptions established by the Supreme Court to the warrant-based-on-probable cause requirement of the fourth amendment, or whether they violate the fourth amendment prohibition against unreasonable searches. The burden is on the defendants to show that the searches authorized by the challenged laws fall into one of these exceptions. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The only exceptions that the defendants suggest are applicable in the instant case are (a) the airport and courthouse exceptions (iv and vi); (b) the "stop-and-frisk" exception (iv); and, (c) the consent exception (vii).

A. *Airport and Courthouse Searches*

In extending the exceptions to the fourth amendment's warrant requirement to searches conducted in airports and courthouses, the courts have carefully balanced "the need to search against the invasion which the search entails" to determine whether the search is reasonable within the meaning of the fourth amendment. *Camara v. Municipal Court,* 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1734–1735, 18 L.Ed.2d 930 (1967):

> On one side of the balance are arranged the individual's legitimate expectation of privacy and personal security, on the other, the government's need for an effective method to deal with breaches of public order.

*New Jersey v. T.L.O.,* — U.S. ——, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985).

The courts have applied the balancing test employed in the airport and courthouse search cases in determining whether warrantless searches of rock concert patrons are reasonable within the meaning of the fourth amendment. *See Gaioni v. Folmar,* 460 F.Supp. 10 (M.D.Ala.1978); *Stroeber v. Commission Veteran's Auditorium,* 453 F.Supp. 926 (S.D.Iowa 1977); *Wheaton v. Hagan,* 435 F.Supp. 1134 (M.D.N.C.1977); *Collier v. Miller,* 414 F.Supp. 1357 (S.D.Tex.1976). As the searches in question are closely analogous to those involved in the "rock concert" cases, these cases will be used in evaluating the reasonableness of the searches under analysis here. In these cases, the airport/courthouse balancing test for reasonableness is broken down into the tripartite considerations of (1) the degree and nature of intrusion entailed by the search, (2) the public necessity for the search measured in terms of potential harm to the public, and (3) the efficacy of the search. The searches authorized by the challenged statute and ordinances will now be analyzed under the same standard.

### 1. *The Intrusiveness of the Search*

### a. *The Reasonable Expectation of Privacy*

The Supreme Court has recently affirmed its well-established doctrine that "even a limited search of the person is a substantial invasion of privacy." *New Jersey v. T.L.O.,* 105 S.Ct. at 741 (citing *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1882–1883, 20 L.Ed.2d 889 (1967)) (the "limited" search in *Terry* was a "pat-down" search or frisk). The degree of intrusiveness of a particular search, as the reasonableness of the search in general, depends largely on the context within which the search takes place. *New Jersey v. T.L.O.,* 105 S.Ct. at 741. The intrusion, in particular, must be measured in relationship to the individual's expectation of privacy at the time of the search. *Blackburn v. Snow,* 771 F.2d 556, 563–564 (1st Cir.1985). The Supreme Court has held that the "controlling" inquiry in evaluating an individual's

expectation of privacy is whether the expectation is one " 'society is prepared to recognize as "reasonable." ' " *Hudson v. Palmer,* 104 S.Ct. at 3199 & n. 7 (quoting in part *Katz v. United States,* 389 U.S. 347, 360–361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

Though it seems clear that society would be "prepared to recognize" that an individual's expectation of privacy upon entering a "public" eating and drinking establishment is necessarily lower than it would be in his own home, society would also be prepared to recognize that it is not diminished to the point where a body search, or pat-down, would be within his reasonable expectation. Society certainly recognizes that individuals entering a public eating and drinking establishment retain a legitimate expectation of privacy as to their persons, as well as to their possessions, that excludes the possibility of a personal search.

### b. *Discretionary vs. Indiscretionary Searches*

The courts have held that where the decision to search is left entirely to the discretion of the searching officers, the intrusion can be particularly great. *See Collier v. Miller,* 414 F.Supp. at 1364; *Wheaton v. Hagan,* 455 F.Supp. 1134 (M.D.N.C.1977). The rationale is that when the search procedure is not applied indiscriminately, but only to isolated individuals at the officers' discretion, a stigma attaches to the search that embarrasses the individual subjected to the search. *See United States v. Skipwith,* 482 F.2d 1272 (5th Cir.1973); *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir.1972). The use of a magnetometer in airport and courthouse searches has been upheld largely due to its indiscriminate method of search. *Collier,* 414 F.Supp. at 1363 (citing *United States v. Edwards,* 498 F.2d 496 (2nd Cir.1974); *United States v. Palazzo,* 488 F.2d 942 (5th Cir.1974)).

The searches authorized by the statute and ordinance in the instant case are not indiscriminate. The decision of which drinking establishments, and which individ-

uals within those establishments, to search, is left entirely within the discretion of the police officers. Every patron of every lounge in Louisiana is not subjected to a search upon entering that lounge. Though defendants point out that the search in question was conducted indiscriminately upon all Uncle Rod's customers, that goes to the question of whether this statute and ordinance are unconstitutional as applied, as opposed to facially. Moreover, the defendants fail to recognize that the decision to search Uncle Rod's, as opposed to some other bar or restaurant, was an act of discretion. Under the laws in question, the officers could have searched only isolated individuals in Uncle Rod's if they had so chosen, just as they chose to search only Uncle Rod's out of all the other bars, lounges and restaurants in Lafayette. The fact that these laws authorize discretionary, as opposed to indiscriminate, searches increases the stigma that attaches to such searches and therefore militates in favor of finding the searches they authorize particularly intrusive. *See Collier*, 414 F.Supp. at 1364; *Wheaton*, 435 F.Supp. at 1145.

#### c. *The Relative Intrusiveness of Different Types of Searches*

The laws at issue, by omission, leave the type and degree of search, as well as the decision to search itself entirely to the discretion of the public officers. The Supreme Court has recognized a "pat-down," or frisk, as a "severe ... annoying, frightening, and perhaps humiliating [intrusion]...." *Terry*, 392 U.S. at 24–25, 88 S.Ct. at 1881–1882. Because a pat-down is the standard police method of searching for weapons, the statute and ordinance in question clearly authorize on their faces at least that severe a level of intrusion.

The defendants have not cited, nor is this court aware of, any case in which a nonconsensual pat-down search for weapons is

permitted in the absence of some particularized level of reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In airport and courthouse searches, the individuals wishing to board airplanes or enter courthouses have to walk through a magnetometer and submit their bags and parcels to an examination for weapons. The courts have reasoned that this sort of search, in contrast to a frisk, involves an "absolutely minimal invasion of privacy." *See, e.g., United States v. Albarado*, 495 F.2d 799, 806 (2nd Cir.1974). Only in the event that a magnetometer is triggered is the reasonable suspicion necessary for an ensuing pat-down engendered.[1]

By contrast, the laws in the instant case authorize "searches," be they pat-downs, body cavity, or merely magnetometer, in the absence of any particularized level of suspicion. Such intrusiveness clearly goes beyond that authorized by the airport and courthouse exceptions. *See also Wheaton v. Hagan*, 435 F.Supp. 1134, 1146 (M.D.N.C.1977); *Collier v. Miller*, 414 F.Supp. at 1365.

#### 2. *Public Necessity*

In determining the public necessity requiring a particular type of warrantless search, the courts have examined the nature and degree of the threat of public danger arguably necessitating the search. In the early 1970's, the courts recognized the public necessity for warrantless airport searches as particularly "grave and urgent" because of the "great threat to hundreds of people," *Albarado*, 495 F.2d at 806, and the "enormous potential for violence," *United States v. Davis*, 482 F.2d 893, 910 (9th Cir.1973), created by the rash of hijackings that occurred during that time. The courts found the nature of the threat created by hijackings particularly grave:

situations where the searched party has not triggered a magnetometer. These searches, however, are also based on some particularized level of reasonable suspicion. *United States v. Moreno*, 475 F.2d 44 (5th Cir.1973), *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973).

---

**1.** The standard policy, however, is that the individual who has triggered the magnetometer has the option of not boarding the plane or entering the courthouse rather than submitting to further search. *Id.* at 801. This court also recognizes that the courts have upheld airport frisks in

**422**

The potential damage to persons and property from [airline hijacking] is enormous. The disruption of air traffic is severe. There is a serious risk of complications in our foreign relations.

*Id.*

Similarly, in authorizing courthouse searches, the courts recognized the immense and very real threat to public safety that arose from the "outburst of acts of violence, bombings of federal buildings, and hundreds of bomb threats, resulting in massive evacuations of federal property, and direct financial loss to the Government," throughout the country. *See Downing v. Kunzig*, 454 F.2d 1230 (6th Cir.1972).

In the "rock concert" cases, involving searches for bottles and cans, *e.g., Collier v. Miller*, 414 F.Supp. 1357, and drugs and alcohol, *e.g., Gaioni v. Folmar*, 460 F.Supp. 10, the courts distinguished the airport and courthouse cases as involving "unique circumstances" not involved in a rock concert case. *See, e.g., Gaioni*, 460 F.Supp. at 13. The searches in these cases were not instituted to uncover weapons or other instruments of mass violence, but rather to find either contraband or objects that could be dangerous if broken or used as projectiles. *Id.* Because the items for which the rock concert patrons were searched posed no threat of public danger equivalent to that posed by a bomb or gun, the courts have consistently held that the necessity of searching rock concert patrons is "minimal" compared to that for airport searches. *See id.* at 14; *Wheaton*, 435 F.Supp. 1134; *Collier*, 414 F.Supp. 1357.

Though, unlike the searches conducted in the rock concert cases, the searches authorized by the state statute and municipal ordinance at issue are for the purpose of uncovering weapons, the searches are nonetheless not justified by the "unique circumstances" present in airport and courthouse searches. The potential damage to hundreds of persons and to property present in the airport and courthouse settings, from a single individual's weapon, is simply not the type of damage the laws in question address.

Furthermore, the "public necessity" addressed by these laws is apparently the danger to individuals in a bar at the hands of one who is armed and intoxicated. This public purpose in no way equals such national concerns as the foreign policy implicated by hijackings, or the threat to the judicial system implicated by courthouse bombings. This court simply cannot find that special circumstances exist in a barroom setting justifying "pat-down" searches of individuals in the absence of any level of particularized suspicion authorized by the laws in question.

Moreover, though no evidence has been put in the record on the matter, this court is willing to assume that patrons of bars who carry weapons are much more likely than patrons of bars who do not carry weapons to commit acts of violence. Yet, logic dictates that anyone who carries a weapon, in or outside of a bar, is more likely than one who does not carry a weapon to commit an act of violence. Nonetheless, the public danger of being harmed by an individual carrying a weapon cannot justify a blanket policy of warrantless searches without probable cause. *See United States v. Skipwith*, 482 F.2d at 1275 & n. 4.

The assumption upon which defendants apparently justify the statute and ordinance is that individuals with weapons *in* bars are much more likely to commit acts of violence than individuals with weapons *outside* of bars. Even if there were evidence that a higher incidence of crime results from concealed weapons in places where alcohol is sold, than from concealed weapons outside of places where alcohol is sold, that evidence alone could not make warrantless searches in such places reasonable. *See id.* at 1275. The Fifth Circuit observed in *Skipwith* that "no court has ever approved a dragnet search of all citizens in a high crime area of any urban center based upon the justification that the danger of criminal conduct would be reduced." *Id.* at n. 4. Accordingly, a degree

of "public necessity" alone, "whether produced by danger, or otherwise," cannot justify an otherwise unreasonable search in the absence of a warrant based on probable cause. *Id.* at 1275. Therefore, in order for the searches authorized by these laws to be reasonable, the possible harm to the public in bars from individuals with concealed weapons must still be measured in relation to the likelihood that warrantless searches of bar patrons will effectively avoid the potential harm, and the defendant must show that this necessity justifies the privacy intrusion the search entails. *Id.*

### 3. *Efficacy*

The necessity of a search must be measured not only in terms of potential public danger, but also in terms of whether "the search procedure will be effective in averting potential harm." *United States v. Skipwith,* 482 F.2d at 1275. The courts have consistently found that airport magnetometer searches are highly effective. *See, e.g., Skipwith,* 482 F.2d at 1275; *Folmar,* 468 F.Supp. at 14. Magnetometers have been found to "detect the 'overwhelming majority' of items searched for, and consequently have caused a dramatic decline in the number of hijackings and bombings." *Folmar,* 468 F.Supp. at 14 (citing *United States v. Albarado,* 495 F.2d 799 (2nd Cir.1974)). The *Folmar* court noted by contrast that the random searching of rock concert patrons is not very effective in controlling drug and alcohol violations at the concert. 468 F.Supp. at 14.

In the instant case, defendants argue that the particular search in question was effective because it uncovered nine knives and one handgun. The laws in question, however, must be analyzed in terms of their overall effectiveness in protecting public safety, and the particular incident at issue in this lawsuit is but one example. The defendant offers no other evidence on the laws' effectiveness. Nonetheless, this court concedes that the laws could have a significant deterrent effect in establishments where they were regularly enforced.

### 4. *The Balancing*

Balancing the need for the Louisiana statute and the Lafayette ordinance, which subject all individuals who enter establishments where alcoholic beverages are sold to an unlimited search, based on neither reasonable suspicion nor probable cause, against the necessity of such searches to curtail the number of shootings and stabbings that occur in barrooms, this court finds that the laws do not meet the test of reasonableness established by the airport and courthouse exceptions. Airport and courthouse searches are justified by a much greater threat to public harm, yet are accomplished by a much lower level of personal intrusion, and are as effective as the constraints of feasible technology allow. The defendants have therefore failed to meet their burden of proving that the searches authorized by the statute and ordinance in question fall within the airport and courthouse exceptions for warrantless searches.

### B. *The Stop-and-Frisk Exception*

Defendants also argue that the searches authorized by these laws fall into the "stop-and-frisk" exception to the fourth amendment requirement of a warrant based on probable cause. The "stop-and-frisk" exception was created by the Supreme Court for the very specific factual situation involved in the case of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In that situation, where a police officer directly encounters a citizen face-to-face, and has a "reasonable suspicion" that the individual is armed and dangerous, the officer may conduct a limited "pat-down" or frisk of the individual's clothing in order to determine if that individual is armed. *Id.* at 24–25, 88 S.Ct. at 1881–1882. Though the officer does not need to have probable cause to conduct such a search, he must have "reasonable suspicion" and be able "to point to specific and articulable facts" on which he bases his suspicion. *Id.*

Clearly, the purpose of the statute and ordinance in the instant case is not to afford officers an opportunity to pat-down

individuals with whom they are confronted and whom they reasonably suspect to be armed and dangerous. The purpose is, rather, to give police officers an opportunity to search for concealed weapons even when an officer's personal safety is not at issue and the persons searched are not reasonably suspected to be armed and dangerous. Yet, as the *Collier* court noted, *Terry* does not "sanction wholesale searches of the general public in the absence of exigent circumstances, regardless of the searching official's valid interest in preventing potential injuries." *Collier v. Miller*, 414 F.Supp. at 1365 (citing *United States v. Davis*, 482 F.2d 893, 906 (9th Cir.1973)).

Moreover, if the reasons for the statute and ordinance were coextensive with the reasons for the stop-and-frisk exception, there would be no need for the laws. Police officers would already be authorized under the United States Constitution, as interpreted by *Terry*, to make the kind of searches they seek to justify under the statute and ordinance. The fact is, these laws authorize *Terry* type searches, but do not require the *Terry* level of particularized suspicion as a requisite to those searches. Consequently, the searches authorized by the laws are not reasonable under the *Terry* exception.

### C. *The Consent Exception*

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schnekloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citing *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1965)). Though defendants do not specifically urge the consent exception as a justification for the laws at issue, they have urged it implicitly in that (1) consent was one of the exceptions considered in the airport, courtroom and rock concert cases proffered by defendants, and (2) defendants' supplemental memorandum emphasizes that the laws in question direct drink-

ing establishment owners to post signs outside their doors notifying customers that entering the premises constitutes consent to being searched for weapons. The purpose of the memorandum is obviously to suggest that the laws at issue mandate "knowing" consent as a requisite to being searched.

In order for consent to constitute an exception to the fourth amendment warrant requirement, the consent must be voluntary. *Schnekloth*, 412 U.S. at 222, 93 S.Ct. at 2045. Voluntariness is a fact to be determined in light of "the totality of the circumstances," and the defendants have the burden of proving that the consent was voluntary. *Id.* The defendants must also show that consent was "unequivocable and specific," *Judd v. United States*, 190 F.2d 649, 651 (D.C.Cir.1951), and an argument that a search is reasonable because it was consented to implicitly is not sufficient. *Collier v. Miller*, 414 F.Supp. at 1365.

In the "rock concert" cases, the courts have held that where public access to a concert is conditioned on the submission to an otherwise unreasonable search, such a search is not justified under the consent exception because it is coerced—not voluntary. *See Collier v. Miller*, 414 F.Supp. at 1366 (citing *United States v. Albarado*, 495 F.2d 799, 806–807 (2nd Cir.1974)). *Accord Gaioni v. Folmar*, 460 F.Supp. at 14. Moreover, in *United States v. Albarado*, 495 F.2d 799, 806, 807 & n. 14 (2nd Cir. 1974), the United States Court of Appeals for the Second Circuit refused to base its decision upholding an airport magnetometer search on the consent exception. It found that "[t]o make one choose between flying to one's destination and exercising one's constitutional right [to be free from an otherwise unlawful search] ... is a form of coercion, however subtle." *See also United States v. Kroll*, 481 F.2d 884, 886 (8th Cir.1973).

In *Gaioni v. Folmar*, as in the instant case, the defendants contended that the searches conducted at the entrance to a civic center hosting a rock concert fell within the consent exception because signs

were placed at the entrances warning patrons that if they entered the concert they were subject to being searched. The signs read:

NOTICE

PERSONS ENTERING THE

MONTGOMERY CIVIC CENTER

AND THEIR

POSSESSIONS

ARE

SUBJECT

TO

SEARCH

NO ALCOHOLIC BEVERAGES
OR ITEMS IN

VIOLATION OF THE ALABAMA
CONTROLLED

SUBSTANCES ACT ARE ALLOWED

The *Folmar* court held first that the defendant simply could not condition public access to the civic center on submission to a search unless the defendant could meet its burden of proving that those subjected to the search consented voluntarily. *Folmar*, 460 F.Supp. at 14–15 (citing *U.S. v. Chicago, Milwaukee St. Paul, & Pacific R.R. Co.*, 282 U.S. 311, 328–329, 51 S.Ct. 159, 163–164, 75 L.Ed. 359). The court then held that the defendants failed to meet their burden of proving that the plaintiffs voluntarily consented to be searched because

[a]ny consent obtained under such circumstances [i.e. through conditioning access to the concert] was an inherent product of coercion, since people undoubtedly felt that if they refused to be searched they would forfeit their right to attend the concert.

*Id.* at 14 [(citing *Collier*, 414 F.Supp. 1357; *Albarado*, 495 F.2d 799)]. The court found further:

Defendants' reliance on the warning signs is misplaced. Voluntary consent cannot be implied solely from the presence of such signs, especially since many patrons never saw them. Of course, the presence of the signs ... has been considered in evaluating the totality of the circumstances.

*Folmar*, 460 F.Supp. at 15 & n. 14.

Under this line of cases, it is clear that the statute and ordinance at issue do not pass constitutional muster on the basis that they require signs to be posted outside of drinking establishments notifying the customers that entrance into the establishment constitutes consent to a search for weapons. There is no guarantee that bar and restaurant owners actually post such signs. Furthermore, as the *Folmar* court noted, even if the signs are posted, there is no assurance that all of the customers entering the bar or restaurant will be aware of the sign. Finally, even if the patrons see the signs, the fact that they go ahead and enter the establishment does not establish that their consent to a search by the police is "unequivocable and specific." *Id.*

This court therefore concludes that the defendants have failed to meet their burden of proving that the Louisiana statute and the Lafayette ordinance fall within the consent exception to the fourth amendment warrant-based-on-probable-cause requirement. As defendants offer no other basis for finding the searches authorized by these laws reasonable within the meaning of the fourth amendment, this court finds that the authorized searches are unreasonable and, hence, the statute and ordinance authorizing such searches are facially unconstitutional.

II. THE CONSTITUTIONALITY OF THE STATUTE AND ORDINANCE AS APPLIED

Having concluded that the statute and ordinance in question are facially unconstitutional, it is not necessary that this court

determine the constitutionality of these laws as applied in the instant case.